Filed 8/24/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S093803 |
| v. | ) | |
| | ) | |
| ROPATI SEUMANU, | ) | |
| | ) | Alameda County |
| Defendant and Appellant. | ) | Super. Ct. No. H24057 |
| _____ | ) | |

A jury in Alameda County Superior Court convicted Ropati Seumanu in 2000 of the first degree murder of Nolan Pamintuan (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), kidnapping to commit robbery (§ 209, subd. (a)), and first degree robbery (§ 211). The jury also sustained special circumstance allegations that Seumanu committed a murder while engaged in the commission of a robbery and a kidnapping. (§ 190.2, subd. (a)(17)(A) & (B).) In addition, the jury found that for all three felonies, defendant used a firearm; to wit, a shotgun. (§ 12022.5.) On November 1, 2000, after weighing the aggravating and mitigating evidence, the jury set the penalty at death under the 1978 death penalty law. (§ 190.1 et seq.) This appeal is automatic. (§ 1239, subd. (b).)

Following the decision in *Jones v. Chappell* (C.D.Cal. 2014) 31 F.Supp.3d 1050, holding that delays in implementing the California death penalty law rendered it unconstitutional under the Eighth Amendment to the United States

Constitution, the parties filed supplemental briefs addressed to that issue. As explained below, we reject the Eighth Amendment claim and otherwise affirm the judgment in its entirety.

## I. GUILT PHASE

### A. Facts

Nolan Pamintuan was engaged to marry Rowena Panelo on May 18, 1996. He spent the evening before, May 17, with friends and family at the rehearsal dinner at a restaurant in Daly City. Panelo gave him a wedding present that night: a black Movado watch engraved with their intended wedding date. After dinner, Pamintuan drove Panelo to her apartment and continued on to Hayward, where he intended to spend the night at his father's apartment. Pamintuan was wearing a brown Gucci watch, a gold engagement ring, a black leather sport coat, an Old Navy-brand pea coat, and boots.

Shortly before midnight, residents on East 13th Street in Hayward heard a gunshot and saw a dark van speeding away with its lights off. One of the neighbors, Luis Hurtado, investigated and found a man bleeding to death in the street. Police were called but the man died of what the coroner's office later determined was a shotgun wound to the chest. Police found no identification of the victim at the scene.

Pamintuan's father woke at 5:30 the next morning and discovered his son had not come home. He located his son's car, an Acura, parked nearby with a security device locked on the steering wheel but the driver's side door was unlocked. Pamintuan's father called police and reported his son missing. At 12:15 p.m., police showed photographs to Pamintuan's brother, Paul, who identified the shotgun victim as his brother, Nolan. Panelo, the victim's intended

2

bride, was told of his murder around 1:30 p.m.; they had planned to marry at 2:00 p.m. that day.

Defendant Ropati Seumanu was also known as Paki, Robert, Afatia Ropati Seumanu, and Ropati Afatia Seumanu. Defendant was a member of the Sons of Samoa street gang, which is affiliated with the Crips, and his gang moniker was alternately "Smurf" or "Mr. Smurf 1." Defendant lived with his large extended family, including his father, in Hayward. Vui Seumanu, defendant's father, was the equivalent of a tribal chief in Samoa and defendant was a direct heir to that title. Approximately 24 people lived in a three-bedroom house with a small 500-square-foot outbuilding in the back, including defendant, his wife, Lefea "Lucy" Masefau, and her daughter, Peggy; defendant's younger brother, Tautai Seumanu; Galuvae "Jay" Palega, his wife and family; 16-year-old Tony Iuli and his wife, Seu Seumanu; and others. Defendant slept in the outbuilding, along with Iuli and others; although the sleeping arrangements were somewhat fluid among the family members, Jay Palega asserted the outbuilding "was really [defendant's] room," and defendant kept his belongings in a cabinet there.

Defendant's activities on the night of the murder were described by Tony Iuli and Jay Palega, both of whom pleaded guilty to reduced charges and testified for the prosecution. That night defendant declared his intention to steal a car in order to commit some robberies, so defendant, Iuli, Palega, and Tautai Seumanu set off to look for a suitable vehicle to steal. They eventually located a van to their liking and Tautai and defendant used a screwdriver to steal it. Back at their family compound in Hayward with the stolen van, the group changed out of their Samoan clothes and donned dark clothes; defendant brought out firearms from the outbuilding. Iuli knew "something big" was going to happen when he saw the guns. Defendant spoke of committing robberies and everyone was "in on the deal." The foursome left the house in the stolen van and began looking for a

3

robbery victim. Palega was driving, Iuli was in the front passenger seat, and the Seumanu brothers, defendant and Tautai, were in the backseat. After considering and rejecting a few possibilities, the group spotted a potential victim and attempted an armed robbery but the intended victim escaped. When the group reentered the stolen van and drove off, defendant chastised Tautai for the botched robbery. They then observed Nolan Pamintuan parking his car and defendant said: "Let's go back and get that guy who just got out of the car." Palega turned the van around.

Defendant, holding a sawed-off shotgun, jumped out of the van with Iuli and confronted the victim. Pamintuan looked shocked and scared and offered defendant the inscribed black Movado watch his fiancée had just given him hours earlier, saying: "Just take this, that is all I have." Defendant took it and then forced the victim into the van. As they drove off, defendant and Tautai stripped the victim of everything he had, including his boots, sport coat, pea coat, ring, wallet, and watch. Defendant became angry when he discovered Pamintuan was carrying only $3 in cash. The victim offered to withdraw money from the bank and was by this time begging for his life.

They drove to a bank with an automated teller machine and defendant warned Pamintuan that if he tried to escape, defendant would kill him. Tautai and Iuli accompanied Pamintuan to the ATM, where he withdrew $300 and gave it to defendant upon returning to the van. Iuli was worried that the ATM camera had photographed him, Tautai, and the van. The foursome wanted the victim to withdraw more money, and when Pamintuan told them of the daily $300 limit they became angry. Defendant ordered Palega to drive away from the bank and find a dark spot. Defendant and Tautai argued over who would kill the victim, while Palega advised against killing him. Iuli exited the van in an attempt to stop the shooting, seeing no point, as Pamintuan had already given them all of his money.

4

Pamintuan continued to beg for his life.  Defendant then shot him in the chest with a single shot from the shotgun.  The four then abandoned the stolen van in the neighborhood and went home.

A neighbor noticed the van around 12:30 a.m., parked, but with its motor running.  When it was there the next morning, with the motor still running, the neighbor called police, who determined that it had been stolen from elsewhere in the city.  It also bore bloodstains, later identified as belonging to Pamintuan.  A few days later police determined the van bore Tautai Seumanu's fingerprints.  Further investigation at the bank revealed video footage from the ATM camera showing Pamintuan, flanked by two larger men, withdrawing $300 from the ATM at 11:45 p.m.  The stolen van was also visible in the video.  A bank patron who used the ATM around the same time told police he saw two men go up to use the ATM, while at least one person stayed in the van with the motor running.  When shown a picture of the victim, the witness thought the smaller of the men was Pamintuan but was not sure.  Shown a photo lineup, the witness chose a picture of Tautai Seumanu as one of the men he saw at the ATM.

Police obtained a search warrant for the Hayward home where Tautai lived with defendant and his extended family.  Defendant and Tautai were at a church function in San Francisco with their families but Iuli and Palega were present at the house and were detained by police.  In a search of both the main house and the outbuilding, police found Pamintuan's brown Gucci watch as well as a variety of ammunition, including shotgun shells.  Police also found several items from Pamintuan's wallet, including the receipt for the late-night ATM transaction.  Police seized defendant's leather sport coat and found an Acura car key in the pocket; later investigation revealed it was the key to Pamintuan's car.  Subsequent DNA analysis revealed the sport coat was splattered with the victim's blood.  Police also found Pamintuan's boots and pea coat.  On a coffee table in the

5

outbuilding, police found the box for the black Movado watch Panelo had given the victim the night he was killed, but it was empty. A criminalist later identified defendant's thumbprint on a box of Remington shotgun shells. At this point, Pamintuan's black Movado watch and engagement ring were still missing.

Police detained Iuli and Palega in a patrol car while they searched the family home. In a conversation surreptitiously recorded, Iuli and Palega expressed their hope that police would not find the murder weapon and they agreed to tell police that Palega's mother had given him the Gucci watch. Police interrogated Iuli early that afternoon and he described the crime to police, informing them who was involved and the role defendant played. Police also questioned Palega, who initially told police the Gucci watch was a gift from his mother-in-law. Police then informed him they recorded his conversation with Iuli. They also falsely informed him the video recording from the ATM showed that Palega was the driver in the van. Palega then changed his story and admitted he was in the van at the bank, and that defendant was the one who shot and killed Pamintuan.

Police were waiting for the Seumanu family when they returned to their Hayward home after church, and on their arrival arrested defendant and Tautai. Defendant had Pamintuan's engagement ring and black Movado watch, inscribed with the victim's intended wedding date, in his shirt pocket. Tautai, interviewed by police, initially explained the gun he was holding accidentally fired. Then he claimed he shot the victim because he had seen their faces. He eventually admitted that defendant shot the victim, and that he (Tautai) had tried to take the blame out of loyalty to defendant, his older brother.

Police, still looking for the murder weapon, returned to the Seumanu family home a few days later with a warrant to search defendant's brown Dodge. They asked defendant's wife, Lefea "Lucy" Masefau, if she had the keys to the car but she told them defendant had the only set of keys. Detective Cardes had a "low

6

key," "friendly conversation" with her which he recorded on a microcassette recorder. Masefau did not mention defendant's alleged alibi or otherwise protest defendant's innocence. Police forced the car's trunk and found a sawed-off shotgun that was later determined to be the murder weapon.

In his defense, defendant presented the testimony of his brother, Tautai Seumanu, who claimed that he was the one who killed Pamintuan. At the time of his testimony, Tautai had pleaded guilty to first degree murder concerning Pamintuan's killing, and had been sentenced to prison. Tautai admitted he told the police many different stories, including that defendant was the actual killer. He claimed he wore defendant's black leather jacket during the crime (thereby explaining how it came to have the victim's blood on it), and that he gave defendant the victim's black Movado watch and engagement ring to sell. Tautai also claimed he gave defendant the murder weapon, asking that he dispose of it.

Defendant's wife, Lucy Masefau, testified that defendant was home with her the entire night of the murder. She admitted she did not tell anyone about defendant's alibi for several years, explaining that she was scared. She did not remember speaking to Detective Cardes after the crime and, after listening to the recording of their conversation, testified she did not think the woman on the tape—who identified herself as defendant's wife—was she. She admitted she was on felony probation for three counts of grand theft auto, and that she had never reported her marriage, living arrangements or defendant's incarceration, to social welfare authorities, which would have reduced her welfare payments. She admitted she had placed some of the money from her welfare payments in defendant's jail account.

**B. Discussion**

    *1. Evidentiary Issues*

        *a. Tony Iuli's Conversation with His Wife*

Tony Iuli, along with Jay Palega, Tautai Seumanu and defendant, kidnapped and robbed Nolan Pamintuan, but aside from Tautai's testimony, the evidence showed that defendant alone fired the shotgun that killed the victim. The prosecutor eventually offered plea deals to Iuli and Palega in exchange for their testimony against defendant. During Iuli's testimony, the prosecutor, Angela Backers, questioned him about a conversation he had with his wife immediately following the crimes. When Prosecutor Backers asked Iuli what he told his wife, defense counsel objected on the ground the evidence was, among other things, hearsay. The court overruled the objection and Iuli replied that he told his wife that "your fucking brother blew some dude away."[1] Defendant contends the trial court erred in overruling his objection because the question called for hearsay to which no exception applied. Further, he argues for the first time on appeal that the trial court's alleged evidentiary error substantially undermined the reliability of his trial, violating his rights under the Eighth Amendment to the United States Constitution. (See, e.g., *People v. Martinez* (2009) 47 Cal.4th 399, 423 ["high court decisions state as a general proposition that the Eighth and Fourteenth Amendments to the United States Constitution prescribe heightened reliability for proceedings in capital cases"].)

    " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Hearsay is generally

---

[1]    Iuli's wife, Seu, was defendant's cousin, but Iuli testified that she was treated as, and considered, a sister to defendant.

8

excluded because the out-of-court declarant is not under oath and cannot be cross-examined to test perception, memory, clarity of expression, and veracity, and because the jury (or other trier of fact) is unable to observe the declarant's demeanor." (*People v. Cudjo* (1993) 6 Cal.4th 585, 608.) To challenge a testifying witness's own prior, out-of-court statement as inadmissible hearsay is unusual,[2] but we agree with defendant that Iuli's own statement to his wife constituted hearsay evidence, for it was an out-of-court statement that was offered for its truth, i.e., that Seu's brother—defendant—killed someone.

Both defendant and the People discuss the applicability of various exceptions to the hearsay rule but we need not address them because, even were we to assume the trial court abused its discretion in admitting the evidence (see *People v. Jones* (2013) 57 Cal.4th 899, 956 ["a trial court's decision to admit . . . a hearsay statement . . . will not be disturbed on appeal absent a showing of abuse of discretion"]), any error was harmless under the *Watson* standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Duarte* (2000) 24 Cal.4th 603, 618-619 [*Watson* standard applies to the erroneous admission of hearsay evidence].) Applying that standard, we conclude that, after examining the entire cause, including the evidence, it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*People v. Watson*, *supra*, at p. 836), because the evidence of defendant's guilt was very strong, if not overwhelming. Iuli testified that he was with

---

[2]     "Hearsay evidence is usually presented by someone other than the declarant. Typically, it consists of the testimony of a witness who heard the declarant make the statement . . . . [¶] Sometimes, however, the hearsay declarant is also a witness at the proceeding in which the out-of-court statement is introduced." (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. Mar. 2014) Hearsay and Nonhearsay Evidence, § 1.9, pp. 7–8.)

9

defendant when they, along with Palega and Tautai, accosted the victim and robbed him, after which defendant shot and killed him. Iuli was thus an eyewitness to the crime. This evidence was corroborated by the testimony of Palega, also an eyewitness, and by evidence that Tautai told police that defendant was the shooter (although he later recanted). That Iuli told his wife the same information was cumulative to this eyewitness evidence and was thus not particularly prejudicial to defendant. Although defendant argues the admission of the challenged statement in Iuli's direct testimony, and not on redirect in an attempt to rehabilitate the witness's credibility, "unduly magnified" the testimony such that it served as "an effective and persuasive, if deceptive, vehicle for bolstering Iuli's credibility," the claim is overstated. As Iuli's testimony was corroborated by Palega's testimony and evidence of Tautai's pretrial statements to police, and the jury was apprised of the circumstances and terms of Iuli's plea bargain, the jury had ample evidence with which to assess his credibility. Moreover, although the trier of fact did not observe Iuli when he made the statement to his wife, defendant remained free to cross-examine Iuli in front of the jury and have him recount the circumstances of the statement. In other words, defendant had a fair opportunity to challenge Iuli's "perception, memory, clarity of expression, and veracity" (*People v. Cudjo*, *supra*, 6 Cal.4th at p. 608) about his assertion that defendant "blew some dude away." Under the circumstances, it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson*, *supra*, at p. 836.)

We reach the same conclusion with regard to defendant's Eighth Amendment claim. Although the People argue defendant forfeited this claim by not specifically raising it at trial, we need not resolve the forfeiture question. Assuming for argument the issue was preserved, because there was no prejudicial

10

error under state law, any error regarding Iuli's testimony about his statements to his wife did not render defendant's trial so fundamentally unfair as to violate his right to a reliable penalty judgment under the Eighth Amendment to the federal Constitution. (*People v. Carrington* (2009) 47 Cal.4th 145, 194–195.)

### b. Iuli's Opinion That Tautai Seumanu Intended to Take the Blame

During the prosecutor's examination of Iuli, the witness described a pretrial encounter he had when he, Tautai and defendant were together in a holding cell. Iuli testified that defendant asked him and Tautai to "take the blame off of him and that he would be out there taking care of us" by sending them money in prison. Iuli testified that he told defendant: "Fuck no. You take your own beef." According to Iuli, Tautai remained silent and did not appear angry. The following then occurred:

"Q. [Prosecutor Backers] What did Tautai do when [defendant] asked one of the two young guys to take the beef?

"MR. CIRAOLO [defense counsel]: Objection. Hearsay.

"THE COURT: Overruled.

"MS. BACKERS: Q. You can answer, sir.

"A. He didn't do nothing.

"Q. What was the look on his face?

"A. Don't know.

"Q. Did he get angry at [defendant] like you did?

"A. No.

"Q. Didn't you tell me he looked like he was going for it?

"A. Yes.

"MR. CIRAOLO: Calls for opinion and conclusion. Ask it be stricken.

"THE COURT: Sustained. It may be stricken.

11

"MS. BACKERS:  Q.  *Have you ever told anybody that Tautai looked like he was going to take the beef for somebody*?

"A.   Yes.

"Q.   What made you say that?

"MR. CIRAOLO:  Calls ultimately for the man's opinion and conclusion.  It has been asked and answered.

"THE COURT:  No.  That is asking for factors he based his conclusion on.  Overruled.

"MS. BACKERS:  Q.  What made you say that, Mr. Iuli?

"A.   I think because it was his brother, his older brother.  He wouldn't want to see his older brother go down."  (Italics added.)

Citing the decision to overrule this last objection, defendant argues the trial court abused its discretion under state law, and also violated the Eighth Amendment, by permitting the prosecution to introduce improper opinion testimony from Iuli regarding Tautai's intention to take the blame for the crimes.  By doing so, defendant claims, the trial court allowed the prosecution to impeach Tautai's credibility before he was able even to take the stand and because Tautai was a key defense witness, such advance impeachment "had a strength far in excess of its actual probative force."  Further, defendant argues, the prejudice from the error was amplified by the prosecutor's reference to Iuli's testimony on this point in her closing argument.

Contrary to defendant's argument, Iuli's testimony regarding his perceptions was not improper opinion evidence from a lay witness.  Evidence Code section 800 provides:  "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:  [¶] (a) Rationally based on the perception of the witness; and  [¶] (b) Helpful to a clear understanding of his

12

testimony." Likewise, we have explained that "[a] lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony." (*People v. Farnam* (2002) 28 Cal.4th 107, 153.) Iuli was a percipient witness to the encounter in the holding cell and he thus spoke from personal knowledge gleaned from his own participation in, and observation of, the event in question. Moreover, after he answered in the affirmative when asked whether he "ever told anybody that Tautai looked like he was going to take the beef" for defendant, Iuli could properly describe *his own motivation* for telling someone that information. As noted, *ante*, the admission of evidence is generally tested by the abuse of discretion standard, and we find the trial court acted within its discretion in admitting Iuli's description of the encounter in the holding cell.

Because there was no error under state evidence law, defendant's federal constitutional claim is meritless as well. (*People v. Carter* (2003) 30 Cal.4th 1166, 1196 ["Defendant's claims of federal constitutional error, entirely dependent as they are on his claim of state law error, likewise must fail."]; *People v. Gurule* (2002) 28 Cal.4th 557, 655 [same].)

### c. Evidence That Defendant Put Out a Contract to Kill Iuli

During his testimony, Tony Iuli several times mentioned, or referred to, his understanding that defendant had taken out a contract on his life, presumably to prevent him from testifying or as retaliation for his decision to assist the prosecution. Defendant was initially successful in preventing questioning on this topic when the trial court sustained his hearsay objection. He did not, however, object to Iuli's later testimony on the same subject, which referenced the alleged contract three different times. He now claims the admission of this "highly inflammatory" evidence violated the hearsay rule as well as his right to due

13

process of law and a reliable determination of facts in a capital trial, guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution. We address the three instances separately, and conclude no prejudicial error occurred.

The issue of an alleged contract to have Iuli killed arose following Iuli's admission that his relationship with defendant soured after he told defendant to "take [his] own beef." The prosecutor then asked: "Well, didn't you get a contract put out on you?" Defense counsel immediately objected, citing "[h]earsay, opinion and conclusion," which the trial court sustained. The court also sustained an immediate follow-up objection of "no foundation." The prosecutor pressed on and asked Iuli about an April 25, 2000, hearing at which both Iuli and Tautai were present in court. Iuli admitted he spoke to Tautai in Samoan at this hearing and told him of his intention to take an offered plea deal from the prosecution. Iuli advised Tautai that if the prosecution should offer him a similar deal, he should take it. The following colloquy then occurred:

"Q. [Prosecutor Backers] What else did you tell [Tautai]?

"A. I told him I have some heat on me.

"Q. You have some heat on you?

"A. Yes.

"Q. What does that mean?

"A. *I have a contract out on me.*

"Q. Did you tell him who put that out on you?

"A. Yes.

"Q. What did you tell him?

"A. *I told him his brother did.*

"Q. *His brother Paki [i.e., defendant], right?*

"A. *Yes.*" (Italics added.)

14

Defense counsel did not object to this first reference to the alleged contract on Iuli's life, an omission defendant acknowledges. The People argue defendant forfeited the claim by failing to object (Evid. Code, § 353, subd. (a); *People v. Hinton* (2006) 37 Cal.4th 839, 894), but defendant contends we should find the issue is properly before us because his trial attorney was constitutionally ineffective for failing to object to the above testimony. As we have often observed, whether or not to object to evidence at trial is largely a tactical question for counsel, and a case in which the mere failure to object would rise to such a level as to implicate one's state and federal constitutional right to the effective assistance of counsel would be an unusual one. (*People v. Abilez* (2007) 41 Cal.4th 472, 493, fn. 3.) An attorney may well have a reasonable tactical reason for declining to object, and " '[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.' " (*Ibid.*)

Here we discern two possible reasons why counsel may have refrained from objecting. First, counsel may have desired not to highlight the evidence by making an objection. "[T]he decision whether to object, move to strike, or seek admonition regarding [undesired] testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem *and whether objection or other responses would serve only to highlight the undesirable testimony*." (*People v. Catlin* (2001) 26 Cal.4th 81, 165, italics added.)

Second, defense counsel may have concluded—despite the trial court's initial decision to sustain a hearsay objection— that the challenged evidence was not hearsay because it was admissible not for its truth but as evidence of Iuli's state of mind that was relevant to his credibility. "Evidence is relevant if it has

15

any tendency in reason to prove or disprove any disputed fact or consequence, including evidence relevant to the credibility of a witness. (Evid. Code, § 210 [citation.]) Thus, ' "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his] credibility and is well within the discretion of the trial court. [Citations.]" ' [Citation.] 'Moreover, evidence of a "third party" threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant.' " (*People v. Abel* (2012) 53 Cal.4th 891, 924–925.) That Iuli "was willing to testify against a former member of the group despite his fear of retaliation was supportive of the credibility of his testimony" and thus admissible despite the rule against hearsay evidence. (*People v. Green* (1980) 27 Cal.3d 1, 20, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239.) Where a sound legal basis exists for the admission of evidence, an attorney is not ineffective for failing to object to its introduction. (*People v. Majors* (1998) 18 Cal.4th 385, 403.)

The testimony that Iuli believed defendant had taken out a contract on his life was admitted not to prove the contract actually existed, but rather to bolster Iuli's credibility by showing that *he believed such a contract existed* and was still willing to testify against defendant. There being a plausible reason why counsel did not object, we cannot conclude on this record that counsel's inaction lacked a reasonable tactical basis. In sum, not only did defendant's failure to object forfeit the issue for appeal, but the substantive claim is meritless.

The issue of the alleged contract on Iuli's life arose again when he testified concerning what Tautai told him at that April 25, 2000, court hearing. This time, defendant adequately preserved the claim by making a timely, and continuing, objection:

16

"Q. And what did Tautai say when you said that his brother Paki had put a hit on you, or put some heat on you?

"A. He said —

"MR. CIRAOLO [defense counsel]: Hearsay. Objection.

"THE COURT: Overruled.

"MS. BACKERS [the prosecutor]: Q. You can answer, sir.

"A. He said don't take — first he said he was going to take the blame, then he said: Don't take the deal and he'll try to talk to — try to talk to his brother.

"Q. To take the heat off of you, right?

"A. Yes.

"Q. So you are sitting here in the courtroom and you are about to take the deal, right?

"A. Yes.

"Q. *You tell Tautai that his brother has put a hit on you?*

"A. *Yes.*

"Q. You basically got a snitch jacket in this case, right?

"A. Yes.

"Q. You were the first one to confess back in May of '96?

"A. Yes.

"Q. And then on April 25th this year, here in this courtroom, *when you told Tautai that his brother put a hit on you, he said he knew about it, right?*

"A. *Yes.*

"Q. And he was going to try to talk you out of the deal?

"MR. CIRAOLO: Excuse me. Continued objection as to what Tautai said on hearsay grounds.

"THE COURT: Overruled." (Italics added.)

17

Defendant contends this passage contains two pieces of inadmissible hearsay. The first is that Iuli believed that defendant had taken out a contract to have Iuli killed. As explained, *ante*, this evidence was not hearsay because it was admissible as circumstantial evidence of Iuli's credibility, i.e., that he was willing to testify despite the perceived danger of his being killed as a snitch. The second piece of allegedly inadmissible evidence was that Tautai knew about the contract. But the significance of Tautai's testimony was not simply that he was aware that defendant had initiated a contract to have Iuli killed, but that Iuli believed Tautai could convince defendant to rescind the contract if Iuli would change his mind and refuse to assist the prosecution. Thus, Iuli testified:

"MS. BACKERS: Q. Tautai was trying to talk you out of taking the deal, right?

"A. [by TONY IULI] Yes.

"Q. *And he told you that if you didn't take the deal that he could talk to his brother about taking the heat off of you, right*?

"A. *Yes.*

"Q. What did you understand that to mean?

"A. Excuse me?

"Q. What did you understand that to mean, that Tautai would talk to [defendant] about taking the heat off, *that he would lift the contract*?

"A. *Yes*." (Italics added.)

Defendant contends the information embedded in this testimony—i.e., that defendant had taken out a contract to have Iuli killed—was inadmissible hearsay. We assume this claim was preserved by defendant's continuing hearsay objection "to what Tautai said," but as we have explained, the hearsay rule was inapplicable because the evidence of the contract was admissible not for its truth but to show Iuli's state of mind. The further point—that Tautai could convince defendant to

18

rescind the contract if Iuli changed his mind about testifying—was similarly admissible despite the hearsay rule, for this information was also relevant to Iuli's state of mind and, thus, his overall credibility: Iuli believed he could avoid being killed if he would decline to assist the prosecutor, but he was willing to testify against defendant anyway.

The next part of Iuli's testimony on which defendant relies for this argument occurred just after the trial court overruled defendant's continuing hearsay objection to Iuli's testimony regarding Tautai's statements:

"Q. [Prosecutor Backers]  And [Tautai] told you he was going to take the blame?

"A. [by Tony Iuli]  Yes.

"Q.    And part of your deal is that if you requested, you would be housed out of state, right?

"A.    Yes.

"Q.    During that conversation on April 25th, this year, towards the end of the conversation, *did you tell Tautai that you have been sitting here for four years for something his fucking dumb-ass brother did*?

"A.    *Yes.*" (Italics added.)

Defendant relies on the highlighted portion of this testimony to argue the trial court abused its discretion in denying his continuing hearsay objection. This was evidence of an out-of-court statement made not by Tautai, but by Iuli, and was apparently offered for its truth (i.e., that Iuli had been in pretrial detention for a murder actually committed by defendant). We need not determine whether this statement was improperly admitted because, like the statement that Iuli told his wife that "your fucking brother blew some dude away," the admission of this hearsay statement, if error, was manifestly harmless. Ample evidence, ranging from Tony Iuli's and Jay Palega's eyewitness accounts of the crimes, to evidence

19

from Tautai Seumanu (before he recanted), as well as evidence that defendant was in possession of property stolen from the victim, that the victim's blood was on defendant's jacket, that the murder weapon was found in a car to which defendant had exclusive access, and that defendant's thumbprint was on a box of ammunition that fit the murder weapon, supported the case against defendant. Moreover, the statement evidence—assuming for argument that it was inadmissible hearsay—was provided by the declarant himself (Iuli) while on the stand, and the jury could thus fairly assess his credibility. In these circumstances, it is not "reasonably probable that a result more favorable to the appealing party would have been reached" had this stray comment been excluded. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Any error was thus harmless.

We also find that the combined effect of any evidentiary errors in admitting certain comments Iuli made while testifying does not require reversal under either state law or federal constitutional law. In light of the ample evidence of defendant's guilt, admission of the various stray comments defendant now challenges, even if error, together do not convince us that it was "reasonably probable that a result more favorable to the appealing party would have been reached" had these comments been excluded. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) There being no prejudicial error under state law, we also find that any error regarding Iuli's testimony did not render defendant's trial so fundamentally unfair so as to violate defendant's right to due process and a reliable penalty judgment under the federal Constitution. (*People v. Jones*, *supra*, 57 Cal.4th at p. 933.)[3]

---

[3] Defendant also contends the prosecutor's subsequent reference during the penalty phase to the alleged contract defendant took out to have Iuli killed

*(footnote continued on next page)*

### d. Admission of Gang Status List

Prior to the parties' opening statements, the court and attorneys discussed the various exhibits. As to exhibit 46, a chart bearing gang nicknames,[4] the prosecutor made a showing in support of admissibility, saying that after Pamintuan's murder, while the four participants were in custody, defendant "wrote out, in handwriting, on a piece of paper this particular chart, which named him first, 'Uso for Life' means 'Brothers for Life.'

"It names Paki [defendant] first, Mr. Smurf, and says America's Most Wanted Samoans. This was a badge of honor for him, a stripe for him. He did this after he committed the murder while he was in custody and he gave that to Tony [Iuli] and asked him to type it up on the computer at Juvenile Hall.

"It is my position that the fact he wrote this out and said his name first, and then said Samoan Style America's Most Wanted Samoans is an admission he did the murder, but indicates consciousness of guilt and indicates absolutely no

---

*(footnote continued from previous page)*

undermined the reliability of the jury's penalty determination. We address that issue, *post*, in part II.B.4., finding the claim was forfeited.

[4]     The exhibit appeared like this:

USO 4 LIFE

| MR. SMURF |  | BIG TONE |
| MAC.JAY | *RIP* | TEO (*I LOVE YOU 4-4*) |
| T. SPOON |  | FAGASA |
| LIL. VIC |  | PETE |
| LIL. JAY |  | LIL. TONE |

SAMOAN STYLE

AMERICA'S          MOST
WANTED     SAMOAN'S!!!

remorse." Defense counsel and the trial court both disagreed, the latter saying it was a "stretch" to characterize the document as an admission by defendant that he had murdered someone. The prosecutor stated she planned on using the document when questioning Iuli and the court deferred judgment on it, saying, "We will cover it again."

The prosecutor did not, in fact, utilize exhibit 46 when questioning Iuli. When later cross-examining Tautai Seumanu, however, she referred to the exhibit in an attempt to impeach the witness. Tautai testified he did not remember the chart and had not previously seen the list. The prosecutor noted that if a gang member commits a murder, he "earn[s] [his] stripes" and is "going to be number one on that list," and then asked, "That is the whole idea behind it, right?" Tautai answered: "Some." Tautai testified that he killed Pamintuan to earn his "stripes," but admitted that although the murder "[w]ouldn't necessarily move me to the top," it would earn him respect in the gang. The trial court overruled defense objections that the questioning lacked a proper foundation (although it sustained some objections the questioning was argumentative or assumed facts not in evidence). Tautai confirmed "uso" meant "brothers for life," and that the first person on the list ("MR. SMURF") referred to defendant, the third person on the list ("MAC.JAY) was Jay Palega, the fourth person ("TEO") was Iuli's brother, Tim Tao, who died in 1998, and the next entry, "T.SPOON," referred to himself, Tautai "Teaspoon" Seumanu. Counsel objected on the basis that the prosecutor had failed to lay a proper foundation, and the prosecutor agreed to establish that the exhibit was in fact a gang status list. The prosecutor then asked the witness, "Mr. Seumanu, . . . if you pulled the trigger in this murder, explain to the jury why you are number five on that list," whereupon the trial court sustained defendant's renewed objection (based on lack of foundation) and the prosecutor moved on.

22

In a somewhat scattershot argument, defendant first contends the admission of testimony concerning the meaning of exhibit 46 was evidentiary error because the prosecutor failed to properly authenticate the exhibit and because it was hearsay.  Defendant forfeited his hearsay claim because he failed to object on that ground.  He did, however, object to the evidence on the ground that it was not properly authenticated, thereby preserving the issue for our review.  We agree the prosecutor never authenticated exhibit 46:  "Authentication of a writing is required before it may be received in evidence."  (Evid. Code, § 1401, subd. (a).)  "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law."  (Evid. Code, § 1400.)  Tautai specifically denied having seen the document previously and disclaimed any knowledge that defendant was its author.  Accordingly, Tautai could not authenticate the document, and because the prosecutor did not otherwise introduce evidence showing the list was in fact a status list for the Sons of Samoa street gang, the trial court erred in permitting the prosecutor to question Tautai about it.  (Tony Iuli would later authenticate the document when he testified at the penalty phase.)  But defendant's objection was eventually sustained, diminishing the possible prejudice.  And Tautai exhibited general familiarity with the nicknames in the document and with the hierarchy of the Sons of Samoa gang in general, information that could have been elicited without reference to the list.  Under the circumstances, we find any error in failing to authenticate the list was harmless.

Second, defendant contends the prosecutor committed misconduct by capitalizing on the improper evidence, "inject[ing] herself into this case as a witness" and "purveying hearsay," and "presenting information to the jurors that she could not reasonably expect to prove . . . by . . . other evidence."  He suggests

23

his federal constitutional rights were violated.[5]  Although defendant did not object on grounds of prosecutorial misconduct, we will assume for purposes of argument that the futility of an objection excused his failure to do so.  Turning to the merits, however, we find no misconduct.  The evidence of the gang status list was, for a time, admitted over defendant's objection for lack of foundation so the prosecutor did not act unethically by continuing to question Tautai about it until the court eventually sustained defendant's objection.  The further claim Ms. Backers was "purveying hearsay" cannot be sustained because the trial court never ruled the gang status list was hearsay.  Finally, we have examined Backers's examination of Tautai and find her use of leading questions, which necessarily included stating facts she assumed the witness would affirm or deny, was justified because Tautai was an obviously hostile witness.  We thus reject the claim the prosecutor's questioning of Tautai about the gang status list constituted misconduct.  We further find no violation of defendant's right to confrontation, due process, and a reliable penalty trial under the Sixth, Eighth and Fourteenth Amendments.

### 2.  Alleged Judicial Misconduct

During his direct examination by the prosecutor, Tautai Seumanu proved an evasive and difficult witness.  Although he previously, and tearfully, had informed police that defendant was the shooter, Tautai later pleaded guilty to the charged crimes, claimed to be the shooter himself and corroborated defendant's alibi defense in his testimony.  When questioned on the stand, however, Tautai refused to provide any specific information about the Sons of Samoa, the street gang to which he and defendant belonged.  Asked who was in the gang, he replied:  "I

---

[5]  Defendant similarly contends that reference to exhibit 46 during the prosecutor's penalty phase closing argument deleteriously affected the jury's penalty decision.  We address that issue, *post*, in part II.B.5.

can't give no names" because "they are not in the case." The prosecutor then remarked: "You are under oath to tell the truth. I know that doesn't mean much to you." Defense counsel quickly interposed an objection to this gratuitous comment, arguing it was improperly argumentative. The trial court sustained the objection, saying: "Ms. Backers, *I know the temptation*, but sustained." (Italics added.) There was no further objection and the prosecutor's questioning of Tautai continued. Defendant now contends the trial court's fleeting comment ("I know the temptation") was judicial misconduct and demonstrated such profound and damaging judicial bias that we must reverse the judgment under both state law and the Eighth and Fourteenth Amendments to the United States Constitution. For several reasons, we disagree.

At the threshold, we conclude defendant's failure to object on this ground forfeited the claim for appeal. As a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review. (*People v. Geier* (2007) 41 Cal.4th 555, 613, overruled on other grounds in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.) Although defendant argues he may be excused from this general rule because an objection would have been futile, the circumstances in no way suggest an objection and request to have the jury admonished would have found an unsympathetic jurist.

Were we to reach the claim despite its manifest forfeiture, we would find it meritless. A trial court should of course refrain from making comments before the jury that might suggest it has allied itself with the prosecution. (See *People v. Harris* (2005) 37 Cal.4th 310, 347.) For example, "[a] trial court commits misconduct if it 'persists in making discourteous and disparaging remarks to a defendant's counsel . . . and utters frequent comment from which the jury may plainly perceive that the testimony of the witnesses is not believed by the judge, and in other ways discredits the cause of the defense . . . .' " (*People v. Fudge*

25

(1994) 7 Cal.4th 1075, 1107.) The trial court's comment defendant challenges does not contravene this rule. Not only was the comment solitary and fleeting, it was also ambiguous in that it may reasonably have been understood by the jury not as an expression of where the court's sympathies secretly lay, but as merely a polite reminder to the prosecutor, *upon sustaining the defense objection*, to maintain her composure in the face of a recalcitrant and combative witness.

Finally, even if the issue were properly preserved and the remark construed as misconduct, the trial court's single, brief comment could not possibly have been prejudicial. " ' "[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial." ' " (*People v. Abel, supra,* 53 Cal.4th at p. 914.) On this subject it is worth noting that the jury was instructed with CALJIC No. 17.30, which instructs the jury to disregard any comment by the trial court that might suggest it disbelieved a particular witness.[6] Under the circumstances, the trial court's single, fleeting and ambiguous interjection could not have prejudiced defendant in any way.

### 3. Alleged Prosecutorial Misconduct: Vouching

#### a. Introduction

As noted above, defendant was charged jointly with codefendants Jay Palega, Tony Iuli, and Tautai Seumanu with the murder, aggravated kidnapping, and robbery of Nolan Pamintuan. As described in more detail below, the

---

[6] Thus, the jury was instructed: "I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness. [¶] If anything I have done or said has seemed to so indicate, you will disregard it and form your own conclusion."

26

prosecutor offered Palega and Iuli a plea deal:  in exchange for their testimony against defendant, they would be allowed to plead guilty to reduced charges.  Both Palega and Iuli took the deal and testified against defendant.  In his opening argument, defense counsel mentioned the plea deal, noted the prosecutor offered the deal after defendant withdrew his speedy trial waiver (time waiver), and suggested the jury could infer the prosecutor did not believe she had a strong enough case to convict defendant without Palega's and Iuli's testimony.  The parties thereafter agreed to a set of stipulated statements (stipulations) informing the jury the prosecutor's decision to offer the plea deals was unrelated to defendant's decision to hasten his trial, and that she independently decided that Palega and Iuli bore reduced moral culpability for the crimes.

Defendant now contends the evidence of the prosecutor's subjective motivation for offering the plea deals was inadmissible, and her closing argument referencing that evidence was misconduct because she thereby improperly vouched for the credibility of her witnesses.  As we explain, defendant forfeited these arguments by failing to object, and the claims are meritless in any event.

### b. Background

At the time of the crimes, Tony Iuli was 16 years old.  By that time he had had multiple contacts with the justice system and knew, when arrested, he would not be treated as a juvenile.  He also knew he was facing life in prison without possibility of parole for the crimes against Pamintuan.  Jay Palega was 18 years old when Pamintuan was killed and learned while in pretrial detention that the prosecution did not intend to pursue the death penalty against him.

The prosecution filed the information in this case on June 19, 1997.  Deputy District Attorney Angela Backers was assigned to prosecute the case on or around December 28, 1997.  Attorney Michael Berger represented Iuli and

27

approached Backers at least three times in 1999, attempting to obtain a plea bargain for his client. He was at that time unsuccessful.

Defendant withdrew his time waiver on March 3, 2000, requiring that trial begin no later than May 2, 2000. Around this time the prosecution offered, and Iuli rejected, two plea bargains. The first deal required that he plead guilty to first degree murder, accept a sentence of 25 years to life in prison, and testify against defendant at the guilt phase of trial. The second deal required that he plead guilty to second degree murder, accept a sentence of 15 years to life in prison, and testify against defendant at both the guilt and penalty phases of trial. Iuli rejected both of these offers because he believed prisoners with life terms would never be paroled by prison authorities. Palega, who was represented by Attorney William Muraoka, subsequently rejected the same offers for the same reason.

The prosecutor then offered a different deal, which Iuli accepted on April 26, 2000. Pursuant to this new deal, Iuli agreed to plead guilty to voluntary manslaughter, simple kidnapping, and attempted robbery, and to admit a firearm use enhancement, in return for a determinate prison sentence of 16 years, eight months. The plea deal also required Iuli to testify truthfully against defendant at both the guilt and penalty phases of the trial. Iuli wrote a letter to Palega urging him to accept the same deal, which Palega did on May 15, 2000. Both men eventually testified against defendant and identified him as the one who shot Pamintuan.

Defendant was represented at trial by Attorneys Michael Ciraolo and Deborah Levy. In Ciraolo's opening statement, he referred to the plea deals Iuli and Palega received: "And one thing I want you to remember is a particular day, and that is March 3d of this year. Because what occurred on that day is my client withdrew his time waiver, which meant he had to commence this trial within 60

28

days.  *And after that date, the prosecution realized that they cannot make the case against my client, that they had to get him by testimony.*

"The prosecution's case revolves around two people, Tony Iuli and Jay Palega.  These men were former co-defendants of the defendant.  They were charged with the same charges that my client was charged with, only the prosecution was not seeking the death penalty.  The prosecution was only seeking, and has only sought, the death penalty against my client.  Those two men were faced with prison, with life without possibility of parole.  They were to die in prison.

"*The prosecution approached them, through their counsel, and offered them, what we say in the criminal vernacular, deals.*  And the deal was that if they testify against my client on the guilt phase of the trial, they would receive first-degree murder convictions.  They had to plead to first degree, which meant 25 years to life.  If they testified against my client at the penalty phase of the trial, they would get a second degree plea bargain, which was 15 years to life.

"Both those men refused that offer.

"*The prosecution was compelled to renegotiate her position* and ultimately offer both these men a fixed term of a maximum of 17 years in prison, 16 years, eight months.  So no matter what happened, they would get no more than 17 years for their testimony.

"When these men testify—they had given statements previously to the police.  The prosecution worked with them with considerable time and effort to get their statements here in court.  When they testify, they are testifying under complete distrust by the prosecution because they have not been sentenced yet."  (Italics added.)

The prosecutor did not object to this argument.  But later, she expressed concern that defense counsel had misled the jury in two ways:  (1) by suggesting

29

she believed she had a weak case; and (2) by asserting that when she realized that defendant's withdrawal of his time waiver would require her to go to trial, she approached counsel for Iuli and Palega and offered them a deal. Contrary to these assertions, she explained, "The truth of the matter is that I never approached Mr. Berger or Mr. Iuli, his client, with a deal until the defense had approached me asking for a deal.

"Mr. Berger, for over one year, was asking me for a deal that would include Tony [Iuli] testifying against the remaining three codefendants and identifying the shooter in the murder. [¶] . . . [¶] And the offer of proof is that after the [section] 1538 [suppression hearing] in this case, . . . Mr. Berger approached me, no less than three times, probably more, whenever he would see me, basically he would say: Have you put together an offer for my client, Mr. Iuli?"

Prosecutor Backers explained that she had been busy trying an unrelated capital case when Mr. Berger approached her about a deal and she had not had the time to consider a plea deal for Iuli until after that trial. But after defense counsel's opening statement, she became concerned the jury had been misled about the pertinent events. Accordingly, she proposed a stipulation, explaining: "So the impression left with the jury that I got desperate because I thought I couldn't prove my case against this defendant, and approached them for deals, is absolutely not true.

"And I am trying to correct that misimpression by a series of stipulations that I have offered that indicate that I had been working on the case for two years providing discovery, and by the time they pulled [their] time [waiver] on March 3d, I had, during the same week, provided them with 1,174 pages of penalty phase discovery, which obviously indicated that I had already worked up a penalty phase, because I was giving them almost 1,200 pages in penalty phase discovery.

30

"*And I would anticipate calling Mr. Berger, and Mr. Muraoka, and having them testify—well, as far as Mr. Berger is concerned, that Mr. Berger is the one who approached me, not me approaching him.*

"And the question I would propose to ask Mr. Iuli when he is on the stand is: You and your lawyer had an agreement that you would take a deal from the prosecution that included you testifying against the others, and you had that agreement that you would take that deal for over a year before you actually pled guilty. And that is the substance of the question I would ask Mr. Iuli.

"And there is a series of questions I would ask Mr. Berger, basically that would prove the offer of proof that I just made; that he came to me and was asking for a deal for quite a long period of time before I made him an offer." (Italics added.)

Defense Counsel Ciraolo protested, arguing his opening statement was "a fair inference on what we believe the evidence would show," and "[w]hat is critical here is that an offer was not made until after we withdrew the time waiver. And the offer that was made by Ms. Backers was rejected. They had—there had to be a further offer. The subsequent offer was accepted.

"Whether Ms. Backers had a case or not, what her rationale was or was not for making an offer, I believe is fair comment in opening statement and outline and final argument.

"If she wants to put her credibility on the line, the evaluation of the case, she is doing so here. And I don't think that is appropriate."

The court found Mr. Ciraolo's argument was permissible, but that the prosecutor should also be permitted to rebut the argument with evidence. The court agreed with defense counsel, however, that the prosecutor's proposed stipulation was "fairly inartful, both the way the stipulation is presented and also the way—the question Ms. Backers wants to pose [to Berger, Iuli's attorney]. It is

31

probably not the best way to approach it." The court then deferred judgment on the matter until a later time, saying: "I think there are other ways to put the information in front of the jury without opening an entire Pandora's box. And what I foresee is the focus of this case being transferred, either intentionally or unintentionally, from the facts of the ultimate issue to prosecutorial conduct and credibility. And I don't think that serves the interest of justice here.

"So let me see if I can come up with something else . . . and then readdress this [later]."

### c. *The Berger and Muraoka Stipulations*

The trial court thereafter proposed a stipulation that stated: "The information in this case was filed in the Superior Court of Alameda County on June 19th of 1997. At that time, California law provided that the defendant had a statutory right to demand a trial on the charges contained in the information within 60 days of June 19th, 1997, or on or before August 18th of 1997.

"The defendant entered a general time waiver waiving his right to a trial within 60 days of June 19th, 1997.

"The defendant withdrew that general time waiver on March 3d of the year 2000. This required that the trial in this case commence on or before May 2d of the year 2000.

"Deputy District Attorney Angela Backers was first assigned this case on or about December 28th of 1997.

"Mr. Michael Ciraolo and Ms. Deborah Levy became attorneys of record for the defendant on or about December 11th of 1998.

"There has been ongoing discovery and the providing of information on the guilt and possible penalty phases of this case by Ms. Backers to Mr. Ciraolo and Ms. Levy since December 11th of 1998.

32

"Mr. Michael Berger, who is the attorney sitting over there, has represented Mr. Tony Iuli in this matter from on or about May 27th of 1996.

"During the year 1999, Mr. Berger approached Ms. Backers on at least three occasions regarding a possible plea agreement which would involve Mr. Iuli being allowed to plead to a lesser offense in consideration for Mr. Iuli providing testimony in this trial.

"Mr. Iuli entered such a plea agreement on April 26th of the year 2000."

Defendant's attorney, Ciraolo, expressly agreed to this stipulation, which was read to the jury.

Later, the trial court proposed two additional stipulations covering the circumstances of Palega's plea. The first one provided: "On May 5th of the year 2000, during an interview with Ms. Backers, defendant Tony Iuli wrote a letter to defendant Jay Palega. The letter was reviewed by Ms. Backers and Mr. Iuli's attorney, Mr. Michael Berger. Mr. Berger placed a phone call to Mr. Muraoka to inform him about the letter. Mr. Muraoka came to the courtroom to pick up the letter. At that time, Ms. Backers informed Mr. Muraoka that the same plea agreement offered and accepted by Mr. Iuli was now being offered to Mr. Palega. Mr. Palega accepted the offer and entered into the plea agreement by pleading guilty on May 15th of the year 2000."

The second Muraoka stipulation provided: "If called to testify, Mr. William Muraoka, an assistant public defender in Alameda County, would testify that on or about May 15th of the year 2000 he had a conversation with Ms. Backers regarding the plea agreement entered into by his client. Ms. Backers indicated to Mr. Muraoka that based on her evaluation of the evidence as the deputy district attorney assigned to this case, that while she believed all four defendants were legally guilty of the murder, her review and evaluation of the evidence led her to believe it was appropriate for her to exercise her discretion as

the prosecutor of the case, to enter into the plea agreements which have been stated on the record."

Defendant's attorney expressly agreed to both Muraoka stipulations, which were read to the jury.

### d. Questioning and Closing Argument

Iuli and Palega were both questioned about the circumstances of their plea bargains on direct and cross-examination. In her closing argument, the prosecutor addressed the deals she made with them in exchange for their testimony, saying: "[T]here are some major differences between the men in that van.

"And the differences are this: the two men in the front seat of that van [i.e., Iuli and Palega] wanted to let [Pamintuan] go. They wanted to let him live. They didn't believe [defendant] should shoot him. They even told [him] not to shoot him. . . .

"If somebody gives up their stuff, you let them go. But [defendant] broke their rule, too. Instead of letting [Pamintuan] go, like they told him to, like they thought they should, he blew [the victim's] chest apart.

"*There is a moral difference, not a legal difference, but a moral difference between the two in the front seat and the two in the backseat. And that is why there were different offers made. And that is the only reason why.*" (Italics added.)

Further: "So the offers that were made, which you now have heard so much about, and you heard the actual conditions of the offer read to the witnesses while they were on the stand, is that those two men in the front seat who wanted to let [the victim] go, let him live, got 16 years, eight months.

"And clearly, after seeing Tautai testify, I think you can see why there is such a difference between the two in the front seat and the two in the backseat. *I*

34

*am sure you can see that that discretion was exercised with a proper amount of integrity.* Because once you met Tautai, and you saw his lack of moral fiber, I am sure that you could see that there was a big difference between the two in the backseat and the two in the front seat.

"What you were told is that the reason those offers were lowered from a life top to a determinate term was because after [defendant] pulled [his] time [waiver] on March 3d, I couldn't prove my case. That is what you were told. I want you to think about the evidence I have in this case and that you now know is true." (Italics added.) The prosecutor then listed all the evidence of guilt, aside from Iuli's and Palega's testimony. She then continued: "You know how compelling and how strong the evidence is in this case. So now you know the truth about why those offers were made to Tony and Jay." Defendant did not object to this argument.

### e. Defendant Forfeited His Claims

Defendant mounts a two-pronged attack on the evidence of Prosecutor Backers's subjective motivation for offering plea deals to Iuli and Palega. First, he contends the evidence was inadmissible because it was irrelevant and immaterial. As we have already explained, challenges to the admission of evidence must be preserved for appellate review with a timely and specific objection at trial. (Evid. Code, § 353, subd. (a); *People v. Hinton*, *supra*, 37 Cal.4th at p. 894.) Here, defendant not only failed to object but his counsel stipulated to the Berger and Muraoka stipulations. Under the circumstances, he may not now be heard to complain, because "when a party enters into a voluntary stipulation, he generally is precluded from taking an appeal claiming defects in the stipulation." (*People v. Gurule, supra,* 28 Cal.4th at p. 623; cf. *People v. Duff*

(2014) 58 Cal.4th 527, 540 ["a stipulation to the excusal of jurors forfeits any subsequent objection to their omission from the jury pool"].)

Second, defendant contends the prosecutor committed misconduct by improperly vouching for the truthfulness of her witnesses, Tony Iuli and Jay Palega, citing three separate incidents: Her direct examination of Iuli, the admission of the Muraoka stipulation,[7] and her closing argument. None of these claims was properly preserved for our review. It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal. (*People v. Pearson* (2013) 56 Cal.4th 393, 426; *People v. Cole* (2004) 33 Cal.4th 1158, 1201.) "The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice." (*People v. Williams* (1997) 16 Cal.4th 153, 254.)

Defendant appears to acknowledge that he failed to object but contends any objection would have been futile. "A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' [Citation.] Finally, the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court

---

**7** The nature of defendant's complaint regarding the Muraoka stipulation is unclear. To the extent he complains the stipulation should not have been admitted, he forfeited that claim when his trial attorney agreed to the stipulation. To the extent defendant means to attack the prosecutor's closing argument, he forfeited that claim as well by failing to object on that ground.

immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

To the extent the prosecutor's questioning of Iuli and her closing argument simply relied on information contained in the stipulations, we agree an objection would have been futile, for by counsel agreeing to the stipulations, they became fair game for questioning and argument. To the extent the prosecutor's arguments went farther than merely relying on the stipulations, such as when she argued there was a "moral difference" between Iuli and Palega, on the one hand, and defendant and Tautai, on the other hand, or when she opined that she exercised the "proper amount of integrity," a timely objection would not have been futile, for it would have provided the trial court an opportunity to prevent the prosecutor from injecting her subjective views into the case. Under the circumstances, we find defendant's claim of prosecutorial misconduct regarding these latter claims was forfeited.

### f. The Merits

Were we to overlook defendant's failure to preserve his misconduct claim and address its merits, we would find the prosecutor did not engage in "deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) As a general matter, "[i]mpermissible 'vouching' may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony." (*People v. Fierro* (1991) 1 Cal.4th 173, 211.) Similarly, evidence of a prosecutor's subjective motivations when prosecuting a case is not

relevant,[8] for "[i]t is misconduct for prosecutors to bolster their case 'by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it.' [Citation.] Similarly, it is misconduct 'to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness.' [Citation.] The vice of such remarks is that they 'may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence.' [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.)

The prosecutor's questioning of Iuli and Palega did not violate these rules. The credibility of these witnesses was, of course, of vital importance and the prosecutor appropriately touched on the circumstances of their plea bargains during her questioning of them on direct examination. (*People v. Bonilla, supra,* 41 Cal.4th at p. 337.) We find nothing in the exchanges defendant identifies between the prosecutor and the witnesses to suggest the prosecutor vouched for the truthfulness of either Iuli or Palega. Although defendant also points to passages in Ciraolo's cross-examination of Iuli, it is unclear how *defense counsel's* questioning is relevant to whether *the prosecutor* improperly vouched for Iuli's credibility. On this record, then, we find the prosecutor did not, in her questioning of either Iuli or Palega, improperly vouch for their credibility.

---

**8** Defendant quotes from *People v. Cain* (1995) 10 Cal.4th 1 (disapproved on another ground in *People v. Moon* (2005) 37 Cal.4th 1, 17), but the reference is inapt. There, we stated: "The prosecutor's *opinion* about the various coparticipants' relative culpability is not relevant to any issue at trial." (*Cain*, at p. 64.) But in *Cain*, a case in which the jury was informed the defendant's accomplice had received a lesser sentence, we merely held that the trial court did not abuse its discretion in excluding evidence at the penalty phase that the prosecution had initially offered the accomplice an even shorter sentence, but later withdrew the offer.

38

We turn finally to whether the prosecutor improperly vouched for Iuli and Palega during her closing argument. The rules are well settled: A criminal prosecutor has much latitude when making a closing argument. Her argument may be strongly worded and vigorous so long as it fairly comments on the evidence admitted at trial or asks the jury to draw reasonable inferences and deductions from that evidence. (*People v. Ward* (2005) 36 Cal.4th 186, 215.) " '[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper vouching.' " (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 337.)

Both defendant and the People quote large portions of the prosecutor's closing argument in which she refers to the information contained in the Berger and Muraoka stipulations. We have examined the prosecutor's argument and conclude her comments were permissible because her " 'assurances regarding the apparent honesty or reliability of prosecution witnesses [were] based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief." ' " (*People v. Ward*, *supra*, 36 Cal.4th at p. 215.) To be sure, at one point the prosecutor refers to her decision to offer plea deals to Iuli and Palega and tells the jury "I am sure you can see that that discretion was exercised with a proper amount of integrity," but even this argument was based on her express assessment of the evidence showing a significant difference between defendant and Tautai (whom she referred to as the men in the backseat of the van) and Iuli and Palega (who were in the front of the van and urged defendant not to shoot Pamintuan). After listing the evidence of defendant's guilt aside from Iuli's and Palega's testimony, she finished the thought: "You know how compelling and how strong the evidence is in this case.

So now you know the truth about why those offers were made to [Iuli and Palega]." To the extent defendant complains the prosecutor obliquely referred to her personal motivation in offering the deals, no misconduct occurred because the trial court had previously ruled such evidence was admissible.

Defendant urges us to find improper vouching despite the prosecutor's reliance on the evidence presented to the jury, arguing that even under such circumstances, her argument may be considered impermissible vouching if she placed the prestige of the government behind the testimony of the two witnesses. We find no such improper vouching here. Ms. Backers never suggested she had other evidence, unpresented to the jury, to support Iuli's and Palega's credibility (see *People v. Turner* (2004) 34 Cal.4th 406, 433 [prosecutor improperly vouched for the credibility of expert witness by referring to the prosecutor's personal knowledge of the witness and his prior use of the witness]), or that she personally believed them independent of the evidence (see *People v. Guzman* (1988) 45 Cal.3d 915, 941, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [having district attorney testify why he offered witness immunity "may well raise" a meritorious vouching claim]). Instead, her argument referred specifically to evidence and inferences drawn from that evidence.

We also reject defendant's claim that counsel was ineffective for failing to object to the prosecutor's closing argument. Not only do we find her argument permissible, we also observe the record suggests Mr. Ciraolo made a deliberate tactical decision to enter into the Berger and Muraoka stipulations. Once those matters were before the jury, the prosecutor could fairly rely on them in closing argument, for prosecutors are given wide latitude during argument and may urge the jury to draw any reasonable inference from the evidence. (See *People v. Hill, supra,* 17 Cal.4th at p. 819.) By declining to object, we assume Ciraolo fairly determined that the prosecutor's argument was permissible and not subject to

40

objection.

Finally, we reject defendant's federal constitutional claims as both forfeited for lack of an objection, and meritless as a substantive matter. " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.) Defendant made no objections expressly or even impliedly referring to the federal Constitution and thus forfeited the issue. Were we to address these claims despite their forfeiture, we would find that (1) because there was no improper vouching under state law, defendant's due process claim is also meritless; (2) because the prosecutor's closing argument was based on the evidence admitted at trial, there was no denial of defendant's confrontation or cross-examination rights under the Sixth Amendment (see *People v. Harris* (1989) 47 Cal.3d 1047, 1083–1084); and (3) because there was no improper vouching under state law, defendant's trial was not rendered insufficiently reliable under the heightened standards demanded by the Eighth Amendment for capital cases (*People v. Cudjo*, *supra*, 6 Cal.4th at p. 623; see *Beck v. Alabama* (1980) 447 U.S. 625, 638).[9]

---

[9] We address defendant's further claim the prosecutor's alleged improper vouching infected the penalty phase of trial, *post*, in part II.B.1.

41

### 4. Other Alleged Prosecutorial Misconduct

#### a. Allegedly Impugning Defendant's Postarrest Silence

Although defendant did not testify, he presented an alibi defense through both his wife, Lucy Masefau, who testified defendant was with her on the night of the crimes, and Tautai Seumanu, who testified that he was the primary participant in the crimes and that defendant was not in the stolen van with him when he, along with Iuli and Palega, robbed and killed Pamintuan. During closing argument, the prosecutor referred to defendant's proffered alibi defense and argued it was not worthy of belief because the circumstances suggested it had been recently manufactured. Thus, Ms. Backers argued:

"Remember the stipulations you got about the fact that when this information was filed against the defendant in June of 1997 that he legally had a right to a trial within 60 days?

"In June of 1997, if you are sitting here and you are innocent and you have an airtight alibi, you can have your trial in 60 days.

"But he didn't. He waived time. He waived time. And that is proven by stipulation in this case.

"Real alibi witnesses do not sit on their alibi and keep it secret for four-and-a-half years while their allegedly innocent husbands are rotting in jail." Defendant did not object to these comments.

In summing up, the prosecutor returned to this subject: "Ask yourself if [defendant] really had an airtight alibi. If he really wasn't there, then how come his three accomplices mention his name and bring it up and put him there right when they get arrested?

"Why would they do that?

"Why wouldn't they say: No, my brother wasn't with us, he was home with his wife.

42

"Because he was with them, that is why. That is how a real alibi works. They would say: Oh, the fourth guy wasn't our brother, he was home.

"They tell it right then, the police go check it out, the alibi is true, [defendant] doesn't get charged. That is how alibis work. They are given up right at the time, not four and a half years later." Again there was no objection.

Defendant contends such argument constituted improper comment on his right to remain silent in violation of his constitutional rights under the United States Constitution. (*Doyle v. Ohio* (1976) 426 U.S. 610; see *People v. Thomas* (2012) 54 Cal.4th 908, 936.) A question of forfeiture is immediately apparent, for defendant did not object to the prosecutor's argument on *Doyle* error grounds. (*People v. Collins* (2010) 49 Cal.4th 175, 202 [an objection is required to preserve *Doyle* error for appellate review].) Defendant acknowledges this omission but contends "the unusual circumstances of this case would render the application of the forfeiture rule itself fundamentally unfair." We are not convinced. The prosecutor's line of argument connecting defendant's willingness to delay the commencement of his trial to the credibility of his alibi witnesses (who came forward relatively late in the process) was not, as defendant claims, "sudden and unforeseen," and defendant's failure to object was not excusable on that ground. Nor are we convinced by defendant's argument that our adherence to routine state procedural law requiring a specific and timely objection to preserve *Doyle* error for appeal (Evid. Code, § 353; *People v. Collins*, *supra*, 49 Cal.4th at p. 202) "would itself constitute a violation of the Due Process Clause of the Fourteenth Amendment [by] confer[ring] on one party the power to manipulate mere procedure for its own undue and unfair advantage." Defendant could have avoided the alleged due process violation by the simple expedient of making a timely and specific objection, coupled with a request the jury be admonished.

43

Nor do we accept defendant's further argument that he may be excused for his failure to object because an objection would have been "useless." Although the failure to object to prosecutorial misconduct may be excused on the ground of futility (*People v. Collins*, *supra*, 49 Cal.4th at pp. 202–203 [discussing the futility exception in the context of *Doyle* error]), nothing on this record suggests such futility.

Were we to overlook this procedural obstacle and find the issue properly before us, we would reject it on the merits. Assuming for purposes of argument the rule in *Doyle v. Ohio*, *supra*, 426 U.S. 610, applies to a prosecutor's closing argument,[10] we would find no error even had defendant properly preserved the claim for our review. The gist of the prosecutor's argument was aimed not at defendant's silence, but that of his primary alibi witness, Lucy Masefau. Thus, when the prosecutor argued that *"[r]eal alibi witnesses* do not sit on their alibi and keep it secret for four and a half years *while their allegedly innocent husbands* are rotting in jail" (italics added), she was plainly arguing that *Lucy Masefau* was not a believable alibi witness. Accordingly, the prosecutor's argument was not intended to have the jury draw negative inferences so much from *defendant's* silence as from *Lucy's* silence. Mere witnesses, of course, have no constitutional right to remain silent. We thus conclude that, even had defendant preserved the issue, his *Doyle* error claim is meritless.

---

**10** The People contend the rule in *Doyle v. Ohio*, *supra*, 426 U.S. 610, applies to the impeachment of a testifying witness only, and is inapplicable to a prosecutor's closing argument. Because we conclude the prosecutor's argument in this case did not constitute *Doyle* error because the argument was addressed to Masefau's silence, not defendant's, we have no occasion to resolve the question regarding the proper scope of the rule in *Doyle*.

*b.  Allegedly Impugning Defense Counsel's Integrity*

During the presentation of the People's case-in-chief, a dispute arose during the examination of Dr. Clifford Tschetter, the autopsy surgeon, who testified he found both shotgun pellets and wadding from the shotgun shell in the victim's body.  During cross-examination, defense counsel had the witness admit his report contained a discrepancy: the written autopsy report made no mention of the shotgun shell wadding.  Moreover, the witness acknowledged the wadding he found in the victim's body was not visible in one of the X-rays taken of the victim's body.  On redirect, Dr. Tschetter identified a photo showing the wadding, soaked in blood, on a table, presumably in the autopsy room.  Detective Cardes later corroborated Dr. Tschetter's testimony, reporting that he recalled the doctor removing the wadding from the victim's body, at which time Cardes photographed it.

The prosecutor touched on this subject briefly in her closing argument: "You met Detective Cardes.  And he had different things to say about this case.  The things that are important for this conversation we are having right now is that he attended this autopsy.  And while he was at the autopsy, he personally saw and photographed Dr. Tschetter removing the pellets and wadding from Nolan's chest.

"There has been a lot said about that wadding in this case.  And Mr. Ciraolo asked Dr. Tschetter:  Well, you didn't dictate into your autopsy report, so how do you know it actually came out of Nolan's chest?

"And Dr. Tschetter told you:  Because I took it out.  I put it in this petri dish.  I labeled it:  Pellets and wadding from Nolan's right chest.  Then it was inside this envelope, which I also signed, which said:  Pellets and wadding from Nolan's right chest.

"And now we know there is a photograph of it lying on a table in the coroner's office covered in blood.

"And you might ask yourself:  Why is all this hullabaloo being made about this wadding?

"I will tell you why.

"That wadding was imbedded in Nolan's chest.  And that means this shooting was at close range.

"Well, why does Mr. Ciraolo care if the shooting was at close range if Tautai is the shooter?

"Why does he care?

"*Because he knows you are not going to believe that Tautai is the shooter. He knows Paki [defendant] is the shooter.*  And he is hedging his bets by making all this conversation about this wadding because *he knows that you know Paki is the shooter*."  (Italics added.)  There was no objection.

Later, during rebuttal argument, the prosecutor briefly returned to the subject:  "*There are several shams that have been put forward to you* in the hopes that you might believe one of them.  And these are those:

"Number one, that the wadding didn't really come from Nolan's chest;

"Number two, that after March 3d the prosecution realized they couldn't make their case and they approached the two codefendants for a deal because there was no evidence in the case;

"[Number three], that Paki was home asleep with his wife, who just never happened to mention his alibi for four and a half years;

"That Tautai is really the triggerman and that Tautai told the police back in '96 that Paki was the triggerman so he could ascend the royal throne to be the tribal chief.

"This is what you have been asked to buy by the defense."  (Italics added.) Again, there was no objection.

Defendant contends the prosecutor twice improperly impugned the personal integrity of defense counsel, once during her closing argument ("[H]e knows you are not going to believe that Tautai is the shooter. He knows Paki is the shooter"), and once during her rebuttal argument ("There are several shams that have been put forward to you"). As he acknowledges, however, he did not object to either argument, as is required to preserve claims of alleged prosecutorial misconduct for review on appeal. (*People v. Hill*, *supra*, 17 Cal.4th at p. 820.) Absent adequate justification for this omission, the claim is forfeited.

Defendant argues we should overlook his failure to object because any objection would have been futile. Arguing that impugning the integrity of defense counsel is "effectively the same error as [a prosecutor's] vouching" for the truthfulness of witnesses, defendant contends that because the trial court permitted the prosecutor to put before the jury her personal motivation in offering Iuli and Palega plea bargains, the court would almost certainly have rejected any objection to the prosecutor's closing argument. Defendant's attempt to link his claim of improper vouching with his assertion the prosecutor improperly attacked the personal integrity of defense counsel is unconvincing. First, as we explained, *ante*, no improper vouching occurred. Second, no reason appears why, had defendant objected that the prosecutor was improperly impugning the integrity of defense counsel, the trial court could not simply have asked the prosecutor to reformulate her argument from stating that defense counsel "*knows* Paki is the shooter" to "*the evidence shows* Paki is the shooter." Perceiving no linkage between the earlier claim of alleged improper vouching and the present claim, we reject defendant's assertion that the "two issues [are] substantially the same." We also reject as contrary to law defendant's further argument that we should assume the jury would have been unable to follow a curative admonition. Instead, absent some indication to the contrary, we assume a jury will abide by a trial court's

admonitions and instructions.  (*People v. Stitely* (2005) 35 Cal.4th 514, 559.)  We conclude defendant forfeited this issue.

Were we nevertheless to overlook this procedural defect and address the merits, we would find error but no prejudice.  " 'A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.'  [Citations.]  'In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks' [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion [citation]."  (*People v. Edwards* (2013) 57 Cal.4th 658, 738.)  "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements."  (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Defense counsel attempted to undermine Dr. Tschetter's credibility by focusing on the discrepancy between the witness's testimony and his written autopsy report.  Accordingly, the prosecutor was entitled to address the matter in closing argument and attempt to convince the jury the discrepancy was of little importance.  But although a prosecutor is accorded wide latitude in attacking the defense's case (*People v. Gamache* (2010) 48 Cal.4th 347, 390), for a prosecutor to claim that defense counsel does not believe in his or her client's innocence is improper (*People v. Edwards*, *supra*, 57 Cal.4th at p. 740; *People v. Thompson* (1988) 45 Cal.3d 86, 112).  The prosecutor crossed the ethical line when she

suggested defense counsel did not personally believe his client's story and, in fact, believed that defendant personally shot Pamintuan.

Contrary to the People's argument, this is not a case in which the prosecutor merely asserted that defense counsel "was aware of the weakness" in the proffered defense; Ms. Backers quite clearly stated defense counsel *"knows* Paki is the shooter. And he is hedging his bets by making all this conversation about this wadding because *he knows that you know Paki is the shooter*." (Italics added.) This argument makes clear the prosecutor improperly argued defense counsel did not believe in his client's innocence.

Also improper was the prosecutor's assertion that defense counsel presented a "sham" defense. A prosecutor may vigorously challenge the validity of any defense, and can characterize the testimony of a witness, including the defendant, as untruthful, but to state or imply that defense counsel has fabricated a defense is generally misconduct. (*People v. Farnam*, *supra*, 28 Cal.4th at p. 171; *People v. Bain* (1971) 5 Cal.3d 839, 847.) To the extent the prosecutor here did not simply argue *the defense* was unsupported by facts and thus a sham, but that *defense counsel "put forward" a sham*, the argument improperly implied that counsel was personally dishonest. " 'An attack on the defendant's attorney can be seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics and decorum [citation], it is never excusable.' " (*People v. Hill*, *supra*, 17 Cal.4th at p. 832, quoted with approval in *People v. Turner, supra,* 34 Cal.4th at p. 430.)

The prosecutor thus committed misconduct in closing argument in two ways: she implied defense counsel knew his client was guilty, and that counsel "put forward" a sham defense, i.e., one he knew was false. Because defendant did not interpose timely and specific objections to the improper argument, the errors were not preserved for appeal. But even had the claims been preserved, reversal

49

would not be required because these two instances of improper argument, considered together, could not have prejudiced defendant. As noted earlier, there was strong evidence of defendant's guilt in the form of Iuli's and Palega's eyewitness testimony, coupled with Tautai's initial identification of defendant as the shooter, defendant's possession of the victim's property and his thumbprint on the box of shotgun shells.[11]

### c. Allegedly Appealing to the Jury's Passions and Prejudices

That defendant robbed and killed Nolan Pamintuan on the eve of the victim's wedding formed the basis of the prosecutor's narrative of the case. She referred to this theme both in her opening remarks to the jury and in her closing argument. Defendant contends these comments so appealed to the jury's passions and prejudices that they strayed into the realm of prosecutorial misconduct because they improperly encouraged the jury to decide the case based on emotion rather than fact. In support, defendant identifies three categories of alleged impropriety, claiming the prosecutor (1) "invoked the theme of the bridegroom murdered on his wedding day, while his bride's gift [of an inscribed watch] became the 'trophy' of a murderer"; (2) improperly asked the jury to view the crime through the eyes of the victim; and (3) improperly referred to the victim and his surviving family as her "clients." As we explain, defendant did not object to these comments and thus failed to preserve any of these claims for appellate review. We also conclude that no prejudicial misconduct occurred.

---

[11] Defendant contends the prosecutor's subsequent reference during the penalty phase to defense counsel's alleged lack of belief in his client, and to the defense as a sham, further undermined the correctness of the jury's penalty determination. We address that issue, *post*, in part II.B.3.a.

### *(i)  Defendant Forfeited These Claims*

As explained, *ante*, in order to preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection to the alleged misconduct and request the jury be admonished to disregard it.  (*People v. Pearson*, *supra*, 56 Cal.4th at p. 426; *People v. Hill*, *supra*, 17 Cal.4th at p. 820.)  Defendant acknowledges his failure to object to the prosecutor's comments but argues that he should be excused from complying with this basic precondition to appeal because, for two reasons, an objection would have been futile.  (*Hill*, *supra*, at pp. 820–821.)  First, in denying defense objections to the prosecutor's cross-examination of defendant's wife, Lefea "Lucy" Masefau, the trial court signaled that it would not have sustained any defense objections to the prosecutor's argument based on an improper appeal to the passions and prejudices of the jury.[12]  We disagree that the prosecutor's examination of Masefau excused defendant from the requirement of a timely and specific objection to the prosecutor's opening statement.  Masefau's cross-examination occurred more than two weeks *after* the prosecutor's opening statement.  Defense counsel could not, at the time of the

---

[12]    Defendant relies on this exchange during cross-examination of defendant's wife:

"Q. [Prosecutor Backers]  You didn't hear about [the crime] during that whole week?
"A.   No.
"Q.   This sweet Filipino boy with interviews from his family all over the news.
"MR. CIRAOLO:  Your honor, objection.
"THE COURT:  Overruled.
"MS. BACKERS:  Q.  You never saw it on the news?
"A.   No.
"Q.   You never saw how traumatized his family was on the news?
"MR. CIRAOLO:  Same objection, your honor.
"THE COURT:  Overruled.
"THE WITNESS:  No."

51

opening statements, have known what objections the trial court would later sustain or overrule. Nor can we say, based on the trial court's overruling of counsel's objection during Masefau's testimony, that it would necessarily have overruled counsel's objection to the prosecutor's closing argument. Significantly, defendant's objection to Masefau's cross-examination did not explain the basis of the objection. Accordingly, to conclude the prosecutor's cross-examination of Masefau and the prosecutor's closing argument were objectionable for the same reason, such that defendant should now be excused from objecting to the later argument, is unjustified.

As a second reason to support his assertion that an objection to the prosecutor's argument would have been futile, defendant analogizes to *People v. Bandhauer* (1967) 66 Cal.2d 524. He argues the prosecutor's "various appeals to passion and prejudice [were] scattered in incremental amounts throughout the arguments in this case," and that the grounds for an objection were not fairly apparent until it was too late to permit an objection and corrective admonition to counteract the prejudice. As he argues: "Once the Pandora's box was opened, no admonition could restore the contents and close it."

In *People v. Bandhauer*, *supra*, 66 Cal.2d 524 (*Bandhauer*), the prosecutor emphasized his position as a public officer sworn to act with fairness and seek justice. But he also opined that in his career he had seldom seen a more depraved character than the defendant. (*Id*. at p. 530). This court concluded the latter assertion was improperly testimonial because "[i]t was not related to the evidence in the case and was not subject to cross-examination. It presented to the jury an external standard by which to fix the penalty based on the prosecutor's long experience. The error was aggravated by the prosecutor's telling the jury that he would recommend life imprisonment in a proper case, for he thus made clear that

52

his request for the death penalty was based on his personal judgment and belief." (*Id.* at p. 530.)

Turning then to the People's argument that the *Bandhauer* defendant had forfeited the issue for appeal by failing to object on this ground, this court rejected it, explaining: "The argument on the public responsibility of the prosecutor was not by itself subject to objection. The testimonial statements were injected gradually into the argument so that it was not until the prosecutor made the clinching assertion that he had seldom seen a more depraved character that grounds for objection were apparent. It was then too late to cure the error by admonition, and any effort of the prosecutor to cure the error by formally retracting what he obviously believed would only have compounded it. Under these circumstances defendant is not precluded from raising the issue for the first time on appeal." (*People v. Bandhauer*, *supra*, 66 Cal.2d at p. 530.)

Apart from the unique facts in *Bandhauer*, the notion that an appellate court should overlook a defendant's failure to alert the trial court to a prosecutor's improper argument if the impropriety is revealed gradually and incrementally has not taken root in our law. We begin by noting the rule requiring claims of prosecutorial misconduct be preserved for appellate review by a timely and specific objection and request for admonition is well established (see, e.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1205; *People v. Whalen* (2013) 56 Cal.4th 1, 52; *People v. Clark* (2011) 52 Cal.4th 856, 960; *People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 305; *People v. Wilson* (2008) 44 Cal.4th 758, 800; *People v. Cole*, *supra*, 33 Cal.4th at p. 1201; *People v. Hill*, *supra*, 17 Cal.4th at p. 820; *People v. Benson* (1990) 52 Cal.3d 754, 794) and long settled (see, e.g., *People v. Brice* (1957) 49 Cal.2d 434, 437; *People v. MacDonald* (1914) 167 Cal. 545, 551; *People v. Ah Fook* (1883) 64 Cal. 380, 383). More than a century ago this court declined to review forfeited claims of prosecutorial misconduct, noting: "It is now

well settled that an appellate court will not consider a claim as to the misconduct of counsel in argument unless objection is so made." (*People v. Fleming* (1913) 166 Cal. 357, 377.) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " (*People v. Green*, *supra*, 27 Cal.3d at p. 27, quoting *People v. Simon* (1927) 80 Cal.App. 675, 679.)

Although two cases have discussed the substantive merits of the misconduct at issue in *Bandhauer*, *supra*, 66 Cal.2d 524 (*People v. Medina* (1995) 11 Cal.4th 694, 776 ["In the present case, unlike *Bandhauer,* the prosecutor did not purport to rely on his own personal experience, his 'many, many years' as prosecutor, or any other facts outside the record."]; *People v. Ghent* (1987) 43 Cal.3d 739, 772 [same]), only one case has acknowledged *Bandhauer*'s procedural holding that a failure to object may be excused if the objectionable material is injected into a prosecutor's argument slowly and incrementally. (*People v. Modesto* (1967) 66 Cal.2d 695, 716–717, disapproved on other grounds in *Maine v. Superior Court* (1968) 68 Cal.2d 375, 383, fn. 8.) But that case distinguished *Bandhauer*, saying: "[I]n this case, unlike *Bandhauer*, a timely objection by the defense would have prevented the most harmful comments from ever reaching the jury[;] and an appropriate instruction could have prevented those remarks which *did* reach the jury from exerting any impact beyond that of defense counsel's own statements. Under such circumstances, an objection may not be made for the first time on appeal." (*People v. Modesto*, *supra*, at pp. 716–717.)

At base, *Bandhauer*'s rationale is that, due to the incremental nature of the improper argument, by the time the basis of an objection was apparent it would have been ineffective to counteract the prejudice flowing from the misconduct. In other words, an objection would have been futile, which is an established

54

exception to the rule requiring an objection.  (*People v. Hill*, *supra*, 17 Cal.4th at pp. 820–821.)  We thus read *Bandhauer* narrowly to illustrate an unusual application of the futility exception, one in which supporting facts are presumably rare, but which, if shown, could support a finding that an objection would have been futile.

The instant case is not one of those rare cases.  From the outset it was clear the prosecutor intended to frame the case as the brutal killing of a man on the eve of his wedding, which understandably resulted in extreme anguish for the bride, the wedding party and the victim's family and friends.  The prosecutor may have intended to sway the jury to her side as an emotional matter, but her argument was based on the facts of the case, not on her opinion of the defendant as depraved. This was, therefore, not a situation in which the true basis of an objection was unclear until the prosecutor uttered a final clinching comment.  As in *People v. Modesto*, *supra*, 66 Cal.2d 696, we conclude a timely objection would have been effective in preventing the harm that could have resulted from the alleged improper argument, and the failure to object thus forfeited the issue for appeal.

### *(ii)  The Prosecutor's Reliance on the Wedding Theme*

Were we to address defendant's claim of prosecutorial misconduct for relying on a wedding theme despite its forfeiture, we would find no error.  " 'The purpose of the opening statement is to inform the jury of the evidence the prosecution intends to present. . . .'  [Citation.]  'Nothing prevents the statement from being presented in a story-like manner that holds the attention of lay jurors and ties the facts and governing law together in an understandable way.' " (*People v. Farnam*, *supra*, 28 Cal.4th at p. 168, quoting *People v. Millwee* (1998) 18 Cal.4th 96, 137.)  In turn, "[c]losing argument presents a legitimate opportunity to 'argue all reasonable inferences from evidence in the record' " (*People v.*

*Bolton* (1979) 23 Cal.3d 208, 212), and a " 'prosecutor has a wide-ranging right to discuss the case in closing argument. [She] has the right to fully state [her] views as to what the evidence shows and to urge whatever conclusions [she] deems proper. Opposing counsel may not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine.'" (*People v. Thomas* (1992) 2 Cal.4th 489, 526.)

In neither instance is it proper to appeal to the passions and prejudices of the jury. " '[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt.'" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130; see *People v. Pensinger* (2001) 52 Cal.3d 1210, 1250 [argument urging the jury to imagine the crime had happened to their own child held an improper appeal to the passion and prejudice of the jury]; *People v. Talle* (1952) 111 Cal.App.2d 650, 676 [closing argument asking for a guilty verdict based on sympathy for the victim was prosecutorial misconduct].)

The prosecutor's reliance on a wedding theme in her opening statement and closing argument did not violate these rules. At the time of the prosecutor's opening statement, she could reasonably have anticipated the jury would be presented with evidence that police found the victim's engagement ring and his Movado watch, inscribed with his wedding date, in defendant's shirt pocket when he was arrested. Such evidence served to link defendant to the crimes against Pamintuan. The prosecutor could also anticipate she would present to the jury evidence showing police found Pamintuan's jacket in the outbuilding where defendant lived, and that the jacket clearly belonged to the victim because police found Pamintuan's wedding "to do" list in the pocket. Therefore, the prosecutor's comments during her opening statement describing the victim as a bridegroom who was focused on renting tuxedos and preparing for his wedding the next day when defendant robbed, kidnapped and murdered him, and her comments

56

regarding his bride's gift of the Movado watch as the "trophy'' of a murderer, were fairly based on evidence the prosecutor reasonably intended to present. When the prosecutor made similar comments during her closing argument, evidence supporting the comments had in fact been introduced. Her argument was thus fair comment on the evidence and did not suggest "that emotion may reign over reason" or invite "an irrational, purely subjective response." (*People v. Lewis* (1990) 50 Cal.3d 262, 284.)

### *(iii) Invoking the Victim*

We reach a slightly different conclusion with regard to defendant's second contention, that the prosecutor acted improperly by asking the jury to view the crime through the eyes of the victim. In closing argument, the prosecutor began describing defendant's actions, and those of Tony Iuli, Jay Palega and Tautai Seumanu, during the last moments of Nolan Pamintuan's life, saying: "Paki starts telling him to give it up, give up everything you've got. Give up whatever you have on him. And Nolan was saying he didn't have anything. Then Tautai and Paki took his wallet and stuff. They are stripping him of his belongings. They were telling him to take his stuff off.

"Paki is starting to go through the wallet. Tautai gets the watch off his wrist, the Gucci watch. Both of them are mad.

"*Imagine begging for your life, begging to be let go, being held captive at the end of a shotgun by these four frightening men, and they get mad at you because you only have a little cash.*" (Italics added.)

The prosecutor later returned to this theme: "Nolan gives the $300 to Paki. Not to anybody else, but to Paki.

"Now they are sitting there at the curb with the sliding door closed and these men, Paki and Tautai and Jay, tells you — actually all four of them got angry

at Nolan because they thought he could get more.  They still weren't satisfied with the amount of money he got out of the machine.

"And he says:  We were all in agreement that he was lying, that he could have gotten more.  And we were angry at him.  And Nolan was saying he wasn't lying, that he took out the most he could get out of the machine.

"So Paki is yelling at him calling him a liar, telling him to stop lying to us.

"*Imagine trying to save your own life, giving them the most you can give them, and you are being called a liar and having a gun pointed at you*."  (Italics added.)

As is apparent, the prosecutor's argument improperly asked the jury to view the crime through Pamintuan's eyes.  "We have settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt."  (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, revd. on other grounds in *Stansbury v. California* (1994) 511 U.S. 318; cited with approval in *People v. Lopez* (2008) 42 Cal.4th 960, 969–970; see also *People v. Leonard* (2007) 40 Cal.4th 1370, 1406–1407.)  Despite this misstep, however, we find the prosecutor's misconduct in making a few remarks in a much longer closing argument, and an even longer trial, could not have prejudiced defendant, especially given the strong evidence of his guilt.  (See *People v. Leonard*, *supra*, at p. 1407 [finding the misconduct was harmless because "the prosecutor's passing remark could not have prejudiced defendant, given the overwhelming evidence of guilt"]; *People v. Stansbury*, *supra*, at p. 1057 [finding the misconduct was harmless because "we do not believe a brief statement of this sort would sway the jury over that long a period"].)

### (iv) The Prosecutor's Clients

The third instance in which defendant contends the prosecutor improperly appealed to the passion and prejudice of the jury came in opening statements, when the prosecutor referred to the victim and his family as her "clients." At that time, the prosecutor noted that the jury had been introduced to the two defense attorneys and their client, defendant Ropati Seumanu. The prosecutor continued: "I have a client too. The chair next to me appears to be empty, but his name is Nolan. And I would like to introduce you to him. [¶] This is Nolan Pamintuan." Later, in closing argument, the prosecutor mentioned some of the victim's family, although she did not refer to any of them specifically as her "clients."

Defendant argues the prosecutor's assertion the victim was her client was an untrue statement (see *People v. Von Villas* (1992) 10 Cal.App.4th 201, 250 [it is a "venerable and long-standing principle that the district attorney represents the People of the State of California in criminal proceedings"]), and "[h]er argumentative purpose [in making such an argument in her opening statement] . . . was to cast the prosecution as a private vindication for a terrible loss in order to exploit the emotion inherent in such a vivid personalization." Later, defendant claims, the prosecutor continued her "personalization and exploitation of sympathetic factors" in closing argument.

Were we to address this claim despite its forfeiture, we would find the prosecutor's argument was impermissible and thus misconduct. "The nature of the impartiality required of the public prosecutor follows from the prosecutor's role as representative of the People as a body, rather than as individuals. 'The prosecutor speaks not solely for the victim, or the police, or those who support them, but for all the People. That body of "The People" includes the defendant and his family and those who care about him. It also includes the vast majority of citizens who know nothing about a particular case, but who give over to the prosecutor the

59

authority to seek a just result in their name.' " (*People v. Eubanks* (1996) 14 Cal.4th 580, 589–590.) But we also conclude that, for several reasons, the prosecutor's misconduct was harmless. First, as explained, *ante*, the evidence of guilt was strong. Second, the jury was instructed that it "must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and a defendant have a right to expect that you will consciously consider and weigh the evidence, apply the law, and reach a just verdict, regardless of the consequences." Third, the jury was also informed that the arguments of counsel are not evidence (see CALJIC No. 1.02; CALCRIM No. 222), and we assume it followed this instruction. (*People v. Stitely*, *supra*, 35 Cal.4th at p. 559.) Contrary to defendant's argument that absent the prosecutor's alleged appeal to the jury's passions and prejudices, "it is reasonably probable that [he] would have been acquitted," we find the prosecutor's arguments, although encouraging the jury to identify with the victim to an improper degree, did not render the trial fundamentally unfair or otherwise infect the trial with such unfairness as to violate defendant's constitutional rights. (*People v. Morales, supra,* 25 Cal.4th at p. 44.)

### d. Allegedly Attempting to Elicit Inadmissible Evidence from *Tautai Seumanu*

Defendant argues the prosecutor committed further prejudicial misconduct by attempting to elicit inadmissible information from Tautai Seumanu on cross-examination. Tautai had recanted his previous statement to police identifying defendant as Pamintuan's killer, pleaded guilty to the charges, and by the time of his testimony had been sentenced to 28 years to life in prison. At trial he asserted that defendant was not Pamintuan's killer, and that in fact he (Tautai) was the triggerman. During Tautai's cross-examination by the prosecutor, he admitted

that, as a juvenile, he could not get any additional time in prison for taking the blame for the murder. The following colloquy then occurred:

"Q. [by Prosecutor Backers] So when you took the deal, you knew Tony [Iuli] was going to testify against you?

"A. [by TAUTAI SEUMANU] Yes.

"Q. And your big brother [i.e., defendant]?

"A. Yes.

"Q. And you knew that all three of you had said that your big brother was the triggerman in '96?

"A. Yes.

"Q. And you asked me for the same deal to testify against your big brother, didn't you?

"MR. CIRAOLO [defendant's counsel]: Objection. Hearsay, privileged communications.

"THE COURT: Overruled.

"MR. CIRAOLO: No foundation.

"THE COURT: Overruled.

"THE WITNESS: When did I ask you this?

"MS. BACKERS: Q. You wanted the exact same deal that Tony [Iuli] and Jay [Palega] got, and I said no way.

"MR. CIRAOLO: Your honor, objection. Counsel is testifying and no foundation.

"THE COURT: Overruled.

"MS. BACKERS: Q. You were willing to come in and say that your big brother was the triggerman if you could get the 'L' [i.e., life term] taken off of your sentence, weren't you?

"A. I didn't.

61

"Q. You didn't want the same deal Tony and Jay got?

"A. Hell no.

"Q. Hell no?

"A. No.

"Q. You wanted to go down for life?

"A. No.

"Q. You never wanted to get out of jail?

"A. No.

"Q. No, you don't want to get out of jail?

"A. No.

"Q. Are you telling this jury that you did not ask me for the same deal Tony and Jay got so you could testify against your big brother?

"MR. CIRAOLO: Same objection, your honor. [¶] Could we approach the bench on this?

"THE COURT: Sure."

At side bar, out of the jury's hearing, defense counsel made clear the nature of his objection:

"MR. CIRAOLO: Your honor, I am objecting. No foundation. Counsel is trying to establish there was a direct communication between the defendant, who is represented by counsel, with her.

"THE COURT: I don't hear him say it didn't happen. I don't see — Mr. Daley is [Tautai's] lawyer. You cannot assert a privilege.

"MR. CIRAOLO: I am objecting there is no foundation.

"THE COURT: She asked him if it happened. He said no. I don't see anybody else asserting any privilege.

"The objection is overruled."

62

Sometime later, outside the jury's presence, Tautai's attorney, Mr. Daley, objected to the questioning:

"MR. DALEY: . . . My concern is the questions addressed to my client about whether or not he had requested a deal. Obviously, he had no communication with [the prosecutor], at least none that I am aware of. I don't think they ever exchanged any words.

"I can say that I did make an inquiry, and was abruptly turned down. And without getting into confidential communications, I can say I did it without any instructions from my client just to see if it was available.

"And I think I communicated that to [the prosecutor] at the time. Of course, we are going back four or five months at this point.

"There was the implication in the record, at this point —

"THE COURT: Well, Mr. Daley, I didn't hear you objecting at the time.

"MR. DALEY: The objection was whether my client had any communications and requested an offer and he answered no, which is true.

"THE COURT: Okay. So —

"MR. DALEY: The implication —

"THE COURT: Mr. Daley, I can't deal with implications if you sit there and don't say anything, okay? So you didn't say anything, he answered no, so that is the end of that story as far as I am concerned."

Based on these exchanges, defendant contends the prosecutor committed three different types of misconduct: (1) She asked questions she knew called for inadmissible evidence (*People v. Pinholster* (1992) 1 Cal.4th 865, 943, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459); (2) "her questions contained representations she knew would not be confirmed by Tautai and could not be proved otherwise" (see *People v. Friend* (2009) 47 Cal.4th 1, 80; *People v. Bolden* (2002) 29 Cal.4th 515, 562); and (3) she knowingly asked

63

questions containing false representations of fact (*People v. Sakarias* (2000) 22 Cal.4th 596, 633).

Assuming for argument that defendant preserved these claims for appeal by making a timely and specific objection, and further assuming the prosecutor committed misconduct, we conclude no prejudice resulted.  Regarding the claim that the prosecutor sought to elicit inadmissible evidence, although the wording of the prosecutor's questions implied that Tautai unsuccessfully sought a plea deal, the witness vehemently denied doing so; when asked whether he wanted the same deal as Iuli and Palega, he replied tersely: "Hell no."  Thereafter, the prosecutor did not present any evidence suggesting that such plea negotiations ever occurred. Prior to its deliberations, the jury was instructed with CALJIC No. 1.02, which states in pertinent part:  "Statements made by the attorneys during the trial are not evidence" and "Do not assume to be true any insinuation suggested by a question asked a witness.  A question is not evidence and may be considered only as it helps you to understand the answer."  We assume the jury followed this instruction (*People v. Stitely*, *supra*, 35 Cal.4th at p. 559), rendering it unlikely under any standard that defendant was prejudiced by the prosecutor's allegedly improper attempt to elicit inadmissible evidence.  (See *People v. Sandoval* (1992) 4 Cal.4th 155, 182 [relying on CALJIC No. 1.02 to find prosecutorial misconduct harmless]).

These same jury instructions undermine defendant's further argument that additional questions constituted prejudicial misconduct.  Although he claims the prosecutor committed misconduct by asking Tautai questions containing "representations she knew would not be confirmed by Tautai and could not be proved otherwise," as well as questions that included false representations of fact, these were mere insinuations by the prosecutor that, when not backed up by actual evidence, were bound to be disregarded by the jury.  We conclude that to the

64

extent, if any, the prosecutor's cross-examination of Tautai crossed an ethical line, any misconduct was not prejudicial.

### 5. *Combined Prejudice*

Relying on the alleged judicial misconduct flowing from the trial court's comment, "I know the temptation" (*ante*, pt. I.B.2.), the allegedly improper admission of exhibit 46, the list of "America's Most Wanted Samoans" (*ante*, pt. I.B.1.d.), and the prosecutor's alleged misconduct in questioning Tautai regarding that gang status list, as well as whether he sought a plea deal (*ante*, pt. I.B.4.d.), defendant contends the combined effect of these alleged errors requires reversal even if the errors do not individually rise to the level of prejudicial error. We have held a number of instances of prosecutorial misconduct may act synergistically to create an atmosphere of prejudice more intense than the sum of its parts. (*People v. Hill*, *supra*, 17 Cal.4th at p. 845; see *People v. Vance* (2010) 188 Cal.App.4th 1182, 1207 [reversing judgment based on a combination of errors, citing *Hill*].) Here defendant seeks to combine alleged judicial and evidentiary errors with prosecutorial misconduct. But as explained, *ante*, the claim of judicial misconduct ("I know the temptation") was forfeited, meritless, and harmless. Nor did prejudice occur when the trial court initially admitted exhibit 46 over defendant's objection. All that remains is defendant's claim of prosecutorial misconduct. As explained *ante*, in part I.B.1., the prosecutor did not commit misconduct by questioning Tautai about the gang status list. And as explained, *ante*, in part I.B.4.d., any error occurring during the prosecutor's questioning of Tautai about prior plea bargain negotiations was harmless because Tautai denied seeking a plea bargain, the prosecutor did not introduce any evidence of such negotiations, and the jury was instructed not to consider insinuations suggested by questions that are not supported by evidence. (CALJIC No. 1.02.) Even considering these matters

65

together, we find the cumulative prejudice flowing from these errors did not render the guilt phase of defendant's trial fundamentally unfair.

### 6.  *Alleged Instructional Error: CALJIC No 2.15*

Defendant, having been found in possession of the victim's watch and ring, was charged with robbery.  The jury was accordingly instructed with CALJIC No. 2.15, which states in pertinent part:  "If you find that a defendant was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crimes of robbery or receiving stolen property.  Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt.  However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt."  As we have observed, this instruction is "generally favorable to defendants; its purpose is to emphasize that possession of stolen property, alone, is insufficient to sustain a conviction for a theft-related crime." (*People v. Gamache*, *supra*,  48 Cal.4th at p. 375.)

Defendant nevertheless contends this instruction violated his constitutional rights by establishing a "permissive inference of guilt based on evidence of conscious possession of recently stolen property" and, because the rule provides that only slight corroboration is thereafter needed, it dilutes the "ineluctable rule that a criminal conviction may be predicated *only* on proof beyond a reasonable doubt.  (*In re Winship* (1970) 397 U.S. 358, 364.)"  We have previously addressed and rejected these precise arguments.  Regarding the claim the instruction creates an unconstitutional permissive inference, we explained in *People v. Gamache*, *supra*, 48 Cal.4th 347, that "the instruction satisfies the due process requirement for permissive inferences, at least for theft-related offenses: the conclusion it

suggests is ' "one that reason and common sense justify in light of the proven facts before the jury." ' " (*Id*. at p. 375.)[13]

We have also previously addressed and rejected defendant's reasonable doubt argument, holding CALJIC No. 2.15 "does not establish an unconstitutional mandatory presumption in favor of guilt [citation] or otherwise shift or lower the prosecution's burden of establishing guilt beyond a reasonable doubt [citations]." (*People v. Gamache*, *supra*, 48 Cal.4th at p. 376.)  Further, "nothing in the instruction . . . relieves the prosecution of its burden to establish guilt beyond a reasonable doubt." (*People v. Parson* (2008) 44 Cal.4th 332, 355–356; see *People v. Rogers* (2013) 57 Cal.4th 296, 336.)  Because defendant advances no persuasive reason why our previous authority addressing this issue was in error, we adhere to them now and reject the claim that CALJIC No. 2.15 violated his constitutional rights.

## II.  PENALTY PHASE

### A.  Facts

Section 190.3, factor (b) defines as a permissible factor in aggravation "[t]he presence . . . of criminal activity by the defendant which involved the use or

---

**13**    Although defendant focuses on the instruction's use of the word "slight" when describing the corroboration requirement, and analogizes to the disparagement by lower federal courts of the rule that, once a criminal conspiracy has been shown, the government need show only a slight connection between the accused and the conspiracy (see, e.g., *United States v. Marsh* (1st Cir. 1984) 747 F.2d 7, 13 & fn. 3), the analogy fails.  Whereas a slight connection to a criminal conspiracy says little about whether the person entertained the mental state necessary to show guilt of conspiracy, "[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt." (*People v. McFarland* (1962) 58 Cal.2d 748, 754.)

attempted use of force or violence or the express or implied threat to use force or violence." Accordingly, the prosecution presented evidence of defendant's numerous prior acts of violence.

In 1991, defendant, 17 years old, was riding in a car with his father. The car in front of them, driven by Jacqueline R., stopped because the car in front of her had stopped to allow a passenger out. Defendant and his father blew the horn and began "acting crazy." When they were able to proceed, defendant and his father pulled up alongside Jacqueline R.'s car and began throwing objects at it, including a length of pipe and a metal tire rack that landed on her hood and narrowly missed the windshield. They chased her as she drove away and continued to throw things at her car. Defendant and his father were arrested for assault with a deadly weapon.

Darrell Churish met defendant in 1991 or 1992. Defendant told him he "claimed" blue, and was the leader of a Crips-affiliated gang called the Sons of Samoa. Churish recalled an incident in which defendant brought a handgun to school. People feared him because he was bigger than most students.

In 1992, still only 17 or 18 years old, defendant and several friends went to Arroyo High School, intent on beating up anyone wearing red, the color of the rival Bloods street gang. When they encountered some students, defendant was the first to throw a punch, starting an all-out melee. He also kicked someone in the head and later told his friend Mannix Molia he felt good and wanted to do it again.

Sometime in 1992, defendant saw a man at a bus stop wearing a Georgetown University jacket. Defendant confronted the man and knocked him down with a single punch, taking his jacket; Darrell Churish confirmed this account but said no punch was thrown. On another occasion, Churish and defendant were at a mall when Churish admired someone's Oakland Raiders

68

jacket.  Defendant offered to forcibly acquire it for Churish, who declined the offer.  Mannix Molia testified that defendant had a new jacket "every other week" and would obtain them by knocking out the jacket's owner.

In 1994, defendant and friends spotted a drunk staggering in a park.  For fun, they chased him but the friends soon gave up.  Defendant persisted, caught him, and punched the man in the head, knocking him unconscious.  According to one of the friends, defendant was "famous" for doing this kind of thing and was known for the power of his punch.  Mannix Molia testified he had seen defendant use this punch four or five times.

One assault occurred around this time when from an apartment balcony Churish saw a man looking into his car's window.  He commented that the man might be considering breaking into his car.  By the time he got down to the street, the man was "all bloody" and had to go to the hospital.  Palega said defendant hit the man in the head with a bottle.

In 1995, defendant and other Samoans attacked Avikash Singh at Mt. Eden High School in Hayward.  They pulled Singh out of his car and beat and kicked him.  They also smashed one of the car's windows and took Singh's wallet and pager.  Iuli saw defendant stomping on Singh's head as he lay on the ground.

In January 1996, defendant and some friends went in Myron Cruz's mother's van to the San Leandro Marina, which was a known location for teens and young adults to have romantic encounters.  They began shaking parked cars to harass the couples inside and one person took exception, exiting his car and yelling profanities.  Defendant and two of his friends beat and kicked the man.  Later, the victim, now in his car, rammed Cruz's van, shearing off the side door.  Defendant and his friends fled.  They trashed the van, dumped it in a creek, and reported it stolen so they would not have to tell Cruz's mother what really happened.

69

In February 1996, rival gang members shouted insults at Iuli when he and others drove down Pompano Avenue in Hayward. Later that evening, Iuli and defendant "decided to pull a drive-by" in retaliation for the insults and returned to the street, firing three shots from defendant's .380-caliber pistol at the house where Iuli had been insulted. The bullets struck the front of the house, one of them penetrating into the living room.

A month later, Hayward police encountered defendant with a group of suspected gang members in Tennyson Park in Hayward and arrested him after finding a .380-caliber pistol in his car, loaded with hollow point bullets.

Defendant had problems with violence while in jail. In August 1996, while in Santa Rita Jail, defendant was written up for making and drinking an intoxicant in his cell. When confronted by a deputy sheriff, defendant behaved in an aggressive and threatening manner, shaking his fists, removing his shirt and throwing chairs around. After he was secured, he threatened the deputy, saying: "I'll take care of you later." In 1998, defendant was involved in a fight in the jail with at least three other inmates. One deputy saw defendant throw at least three or four punches. In 2000, defendant refused to return to his cell during a lockdown. When ordered into an isolation cell, he refused and became aggressive and hostile. He complied only when threatened with pepper spray. A search of his cell uncovered illegal tattooing implements, for which he was assessed a 20-day loss of privilege.

In addition to section 190.3, factor (b) evidence, the prosecution presented victim impact evidence in aggravation. (*Payne v. Tennessee* (1991) 501 U.S. 808.) The victim's brother, Paul Pamintuan, was to be the best man at the wedding. Only 18 months younger than Nolan, Paul was very close to the victim and went to him for advice, relying on his counsel as an older brother. Rowena Panelo testified that the victim was both her fiancé and her best friend. He was a

70

caring, thoughtful and loving person. The victim's mother, Dr. Clementina Manio, gave similar evidence. All three witnesses recounted the difficult circumstances of May 18, 1996, when Nolan Pamintuan was missing and how and when they learned of his murder. Panelo testified that the experience was "[r]eally difficult to explain. I mean, it is just heartbreaking. You are looking forward to something, a really happy part of your life, and to realize that wasn't going to happen, that you will never see this person you love so much ever again, it is just very hard." The victim was buried in the tuxedo he had intended to wear at his wedding, and his funeral was held in the church where he was to have been married.

The defense case in mitigation focused on defendant's family life and cultural heritage. He was born in American Samoa in 1975, the son of Vui Seumanu, who was a *matai*, or tribal chief. Defendant was the heir to this status, and he chose to follow tradition and submit to several days of painful ritual tattooing in which a shark tooth dipped in ink was used to cover his body in tattoos from his knees to above his waist.

Defendant's mother died when he was only two years old and his father left him with a relative when he moved from Samoa to the mainland. Defendant later joined his father in California after he had remarried. Defendant's father had seven more children with his new wife (including Tautai Seumanu), defendant's half siblings. Defendant's stepmother, Sao Seumanu, testified defendant was a helpful child—her "right hand"—helping to take care of the younger children. She asserted defendant was "a really good person" who, when he began working, gave his entire paycheck to her to help feed the family. She did not know he was in a gang, had never seen him with a gun, and denied knowing anything about the nine millimeter ammunition and large-capacity ammunition clips found in her

71

bedroom in the family compound where she lived with defendant.  She admitted she had been convicted of welfare fraud.

Defendant's father, Vui Seumanu, was a pastor in the First Samoan Gospel Church and defendant eventually became a deacon in the church, helping with the younger children and with the choir.  Vui said defendant was very responsible in taking care of his many siblings while Vui was away on church business.  He admitted he had a 1998 conviction for welfare fraud.

According to defendant's half sister, Hanna, he was a good husband and father, and treated his wife's daughter, Peggy, as his own child.  When defendant's grandfather was sick, defendant moved in with him and acted as his caretaker for a year.  Other relatives testified to defendant's good nature.

A defense expert, Clarence Scanlan, himself a high chief from American Samoa, explained that, because of his physical size and status in the Samoan community, defendant "is going to be the protector of his younger brothers, sisters, family members, whatever the type of situation, a friend or associate, or fellow whatever it is.  It is not [his] role to be the aggressor.  It is his role to take down whoever it is, because he can't let the lower subordinate be the one to settle the situation, because he will lose his esteem and position within the gang, or the organization, or village, or whatever it might be.  So his role is more as a protector."  The witness opined that defendant's role in his family and culture explained many of the violent incidents admitted in aggravation, noting that many were "for protection of his family members.  There [are] some bad ones he did, and I think that is reflective of his establishing his name and making people fearful of him, the more fearful people become of you, the less you have to flex your muscle and go out there and enforce whatever you have."

### B. Discussion

#### 1. Alleged Prosecutorial Vouching

Emphasizing the jury was instructed at the penalty phase to consider all the facts adduced during the entire trial,[14] defendant argues the prosecutor's closing argument in the penalty phase of trial improperly capitalized on her earlier, guilt phase, vouching for Iuli's and Palega's credibility. Defendant did not object to the prosecutor's penalty phase argument on this ground and thus forfeited the claim for appeal. In any event, we found no improper vouching at the guilt phase (*ante*, pt. I.B.3.f.), and the prosecutor's penalty phase argument merely emphasized the moral decision the jury was required to make. For example, the prosecutor asserted that "[y]ou are charged with returning a moral and just verdict for this crime and for this sweet innocent life that was taken so brutally." We previously have found similar arguments permissible. (See, e.g., *People v. Rountree* (2013) 56 Cal.4th 823, 859 [prosecutor could fairly argue " '[c]apital punishment is merely society's expression of the moral outrage of particularly offensive conduct' "].)

Aside from whether the prosecutor at trial affirmatively vouched for the credibility of her witnesses, defendant also suggests that simply by allowing Iuli and Palega to plead to lesser offenses carrying determinate terms, the prosecutor implicitly communicated to the jury that she personally viewed their roles in Pamintuan's murder as less serious than defendant's role, and that the death penalty was morally appropriate for the criminal actor who was not allowed to plead, i.e., defendant. To the extent this could have been an implied message of

---

**14**     See CALJIC Nos. 8.84.1 ("You must determine what the facts are from the evidence received during the entire trial . . . ."), 8.85 ("In determining which penalty is to be imposed . . . you shall consider all of the evidence which has been received during any part of the trial of this case").

73

Ms. Backers's exercise of prosecutorial discretion, such implications are faint and are present whenever a prosecutor draws distinctions between multiple criminal actors; as such, they do not rise to the level of improper vouching concerning the appropriate sentence for defendant. In any event, any possible prejudice was avoided by a special jury instruction, given at the request of the prosecution, informing the jury that the sentences of Iuli, Palega and Tautai had no bearing on what sentence was appropriate for defendant.[15] We assume the jury followed this instruction. (*People v. Stitely, supra,* 35 Cal.4th at p. 559.)

### 2. *Trial Court Comments During Pretrial Voir Dire*

At the penalty phase trial, the jury was instructed pursuant to CALJIC No. 8.88 as follows: "It is now your duty to determine which of the two penalties, death or imprisonment in the state prison for life without possibility of parole, shall be imposed on the defendant.

"After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"An aggravating factor is any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its

---

[15] That instruction read as follows: "In deciding the appropriate penalty for the defendant, you should consider the character and record of the individual offender on trial before you and the circumstances of his particular charged offenses. The sentences of the accomplices [are] not a factor in mitigation and it has no bearing on the defendant's character or record and it is not a circumstance of the offense. Therefore, the sentences of the accomplices should not be considered in your determination of the appropriate penalty for the defendant in this case."

74

injurious consequences which is above and beyond the elements of the crime itself.

"A mitigating circumstance is any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.

"In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that *the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole*." (Italics added.)

Capital defendants often argue the italicized sentence in this standard instruction, especially the phrase "so substantial," is impermissibly vague and ambiguous, but we have rejected the claim. (See, e.g., *People v. Jones*, *supra*, 57 Cal.4th at p. 980.) Defendant admits the instructional language "is neither unclear nor ambiguous," but complains that during pretrial voir dire proceedings, the trial court injected ambiguity into the trial by commenting to the prospective jurors that the phrase "so substantial" in CALJIC No. 8.88 was "fairly ambiguous." Thus, for example, the trial court informed a panel of venirepersons: "The key phrase in that instruction is: 'are so substantial.' *And that is a fairly ambiguous phrase.* And the law intends it to be such because the law recognizes that you will be

75

engaging in the moral weighing process when you weigh that type of evidence."
(Italics added.) The court repeated this comment several times before different
panels of venirepersons.

At the outset, we conclude the issue was not preserved for appeal by a
timely and specific objection to the trial court's comments. (*People v. Monterroso*
(2004) 34 Cal.4th 743, 759 [claim of judicial error based on a judge's comments
during voir dire proceedings is forfeited by failure to object].) Although defendant
relies on section 1259 to excuse his failure to object, the argument cannot be
sustained. That statute permits a defendant to raise on appeal a claim challenging
"any instruction . . . even though no objection was made thereto in the lower court,
if the substantial rights of the defendant were affected thereby." Defendant is not,
however, challenging the correctness of a jury instruction; indeed, he asserts that
he is "*defending* CALJIC No. 8.88's formulation of the 'so-substantial' standard
against the trial court's misleading and erroneous 'amplification' of it." As is
clear, his claim is one of judicial error, not misinstruction of the jury, and that
claim is subject to the requirement that a defendant make a timely and specific
objection in order to preserve the issue for appeal.

Were we nevertheless to overlook such forfeiture and address the merits of
the claim, we would find no error. As we explained in another case in which the
trial court made some nonstandard comments to the venirepersons during jury
selection: "The trial court . . . was not instructing the jury at the time it made the
comments in question. Indeed it was conducting voir dire of prospective jurors.
Its 'comments "were not intended to be, and were not, a substitute for full
instructions at the end of trial." ' [Citation.] ' "The purpose of these comments
was to give prospective jurors, most of whom had little or no familiarity with
courts in general and penalty phase death penalty trials in particular, a general idea
of the nature of the proceeding." ' [Citation.] In the context of voir dire, the trial

76

court's comments in this case were proper." (*People v. Romero* (2008) 44 Cal.4th 386, 423.)[16]

Finally, any error was harmless. "[A]s a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors or misconduct 'prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the penalty issue confronting it.' " (*People v. Medina, supra,* 11 Cal.4th at p. 741 [addressing the prosecutor's comments during voir dire].) This is especially true because the trial court, when informing the venirepersons that the "so substantial" phrase was ambiguous, also told them it was speaking informally, and that if chosen to serve, the jurors would be given formal instructions at the

---

[16]    To the extent defendant claims "the obfuscation of the so-substantial standard by the trial court's comments was exacerbated here also by the trial court's use of 'good' and 'bad' as synonyms for mitigation and aggravation," this claim too was forfeited by the failure to object. In any event, this court has itself endorsed such comments as substantially correct so long as the jury is also informed that it is making a moral choice and not just a mechanical one. (See *People v. Edwards* (1991) 54 Cal.3d 787, 841 ["This court in the past has used the terms 'good' and 'bad' evidence as shorthand for mitigating and aggravating evidence."].) The jury in this case was so informed.

We also reject, as forfeited and without merit, defendant's further claim that the prosecutor's closing argument exacerbated the trial court's pretrial comments characterizing the "so substantial" phrase as "fairly ambiguous." The prosecutor vigorously argued the jury should reject an anticipated plea from the defense to show defendant mercy, compassion and sympathy in light of the many times defendant victimized people over the years, ending her argument by asking: "Isn't that morally perverted to ask for leniency for somebody like that?" Defendant did not object to this line of argument, thereby forfeiting the claim, but in any event we would reject as both exaggerated and unpersuasive the claim that "in a case in which the so-substantial standard has been severely distorted, [the prosecutor's] argument would tend both to reflect the [judicial] error and then refract it back only to increase the risk of misunderstanding and misapplication."

close of evidence.  Because the penalty phase jury was later properly instructed with the standard penalty phase instructions, we find that even if error occurred, it was not reasonably possible it affected the penalty verdict.  (*People v. Abilez*, *supra*, 41 Cal.4th at pp. 525–526.)

Finally, defendant's attempt to inflate the trial court's pretrial comments into judicial error that both violated his federal constitutional rights and is reversible per se as structural error (see *Sullivan v. Louisiana* (1993) 508 US. 275, 279–280 [erroneous reasonable doubt instruction requires reversal]) is baseless. As noted, the jury was properly instructed at the penalty phase and the court's comments during the pretrial phase could not reasonably have undermined the efficacy of those instructions.

### 3.  Alleged Prosecutorial Misconduct

#### a.  Impugning Defense Counsel's Integrity

Reprising a claim of alleged prosecutorial misconduct from the guilt phase, defendant claims the prosecutor's guilt phase argument suggesting defense counsel knew his client was guilty, and that the proffered alibi defense was a sham, amplified the prejudicial effect of the prosecutor's subsequent penalty phase argument suggesting it was "morally perverted to ask for leniency for somebody like [defendant]."  Defendant argues the earlier guilt-phase misconduct "referred forward to the penalty phase" such that "the substance of the slander against defense counsel's integrity hovered over the entire trial."  Such argument, defendant contends, unfairly undermined trial counsel's argument in favor of mitigation and mercy "*not* on the basis of evidence, but rather on the basis of an extra-evidentiary animadversion against the integrity of the defense counsel." According to defendant, such criticism of defense counsel is not a recognized aggravating factor under section 190.3 (see *People v. Coffman and Marlow* (2004)

34 Cal.4th 1, 108 ["Any aggravating evidence not relating to the sentencing factors enumerated in section 190.3 is inadmissible in the penalty phase."]; see *People v. Boyd* (1985) 38 Cal.3d 762, 773–776 [first stating the rule]), and the prosecutor's reliance on it violated both that statute and his constitutional rights under the Eighth Amendment to the United States Constitution.[17]

We agree with the People that defendant forfeited this claim by failing to object on the identified ground. We previously explained that the issue of whether the prosecutor improperly attacked the integrity of defense counsel was forfeited by counsel's failure to object at the guilt phase. (*Ante*, pt. I.B.4.b.) Although defendant attempts to tie that issue to the prosecutor's rhetorical question ("Isn't that morally perverted to ask for leniency for somebody like that?") during closing penalty phase argument, the prosecutor's question does not appear linked to the earlier comments about counsel's integrity. Without an objection explaining this theory of exclusion to the trial court, this matter was not properly preserved for our review. Even were we to overlook this procedural obstacle, we agree with the People that the prosecutor's question, either alone or in combination with earlier

---

**17** For his Eighth Amendment claim, defendant cites *Roper v. Simmons* (2005) 543 U.S. 551, where the United States Supreme Court ruled that states may not, consistently with the Eighth Amendment, execute criminal offenders, even those convicted of first degree murder, who committed their crimes before their 18th birthday. In explaining its ruling, the court said: "The Eighth Amendment guards against the execution of those who are 'insufficient[ly] culpab[le],' [citation], in significant part, by requiring sentencing that 'reflect[s] a reasoned *moral* response to the defendant's background, character, and crime.' *California v. Brown,* 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). Accordingly, the sentencer in a capital case must be permitted to give full effect to all constitutionally relevant mitigating evidence." (*Id.* at p. 603, underscoring added.) By citing and quoting this passage, defendant may be understood to argue that the prosecutor's argument undermined the jury's ability to fairly assess his proffered mitigating evidence and to reach a reasoned and moral decision on the question of the proper penalty.

statements made in closing argument at the guilt phase, was harmless because it was not reasonably possible the argument affected the penalty verdict. (*People v. Abilez*, *supra*, 41 Cal.4th at pp. 525–526.)

### b. Reference to Richard Allen Davis

Following his conviction at the guilt phase of the trial, defendant decided to forgo his right to wear street clothes and to instead appear before the jury in jail clothes. The trial court accordingly informed the jury that it was not to consider defendant's dress as a factor in its deliberations. Thereafter, during the penalty phase examination of defense expert Dr. Marlin Griffith, Defense Counsel Levy asked him whether, hypothetically speaking, a criminal defendant's decision not to wear civilian clothes and begin appearing before the jury in jail clothes would have "psychological implications" for the expert's assessment of the person. Dr. Griffith replied: "Well, given the gravity of Mr. Seumanu's case, and given the psychological information that I have previously pulled together, yes, I am very surprised that Mr. Seumanu is dressed in the county jail uniform as opposed to civilian clothes." The prosecutor briefly cross-examined the witness on this point.

Later, in closing argument, the prosecutor urged the jury to disregard Dr. Griffith's testimony, characterizing it as "psychobabble" that "doesn't mean a thing." Ms. Backers then said this: "The guy — do you remember what Richard Allen Davis did to his jury after he got convicted?

"Same thing [defendant] did to you. You convicted him of first degree murder and specials. And guess what? He thumbed his nose at you, took down his hair, put his jail clothes on and said: You can't touch me. I am not afraid of you." There was no defense objection.

Defendant contends the prosecutor's reference to Richard Allen Davis, the notorious kidnapper and killer of a 12-year-old child in 1993 (see *People v. Davis*

(2009) 46 Cal.4th 539), constituted prosecutorial misconduct requiring reversal.[18] That the issue was forfeited by the failure to object is immediately apparent (*People v. Hill*, *supra*, 17 Cal.4th at p. 820) and although defendant claims an objection would have been futile (*id*. at p. 721), no reason suggests such futility. The prosecutor did not equate defendant to Davis in terms of comparative moral fault, but raised only the side point that both defendants demonstrated contempt for their respective juries. Accordingly, even assuming the argument was improper, an admonition would likely have been sufficient to cure any harm. We thus conclude defendant forfeited the issue.

Were we to address the issue, we would find no error. "In general, prosecutors should refrain from comparing defendants to historic or fictional villains, especially where the comparisons are wholly inappropriate or unlinked to the evidence." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1213, quoted with approval in *People v. Jablonski* (2006) 37 Cal.4th 774, 836–837.) Although defendant's choice of attire was not as confrontational as Davis's obscene gesture to the jury,[19] one could fairly argue that, in choosing to wear jail clothes, defendant demonstrated disdain for the solemnity of the proceedings. Considering

---

[18]    Defendant also initially claimed the prosecutor's reference to jail clothes in her closing argument was misconduct, but has since withdrawn that claim in light of the People's counterargument that it was based on defense counsel's examination of Dr. Griffith.

[19]    Defendant requests we take judicial notice that when the verdicts in Davis's case were read, he turned to the television camera and raised both hands with his middle fingers extended. The request is improper because defendant does not comply with California Rules of Court, rules 8.252 and 8.520(g), which require requests for judicial notice to be filed under separate cover. It matters little because there is no dispute as to Davis's actions in gesturing to the jury. (*People v. Davis*, *supra*, 46 Cal.4th at p. 563 [describing these events].)

81

the wide latitude afforded prosecutors during argument (*People v. Gamache*, *supra*, 48 Cal.4th at pp. 371–372), the prosecutor's argument comprised fair comment on the evidence.

### 4. *Alleged Improper Exploitation of Evidence of a Contract to Kill Iuli*

During her closing argument at the penalty phase, the prosecutor made this remark when addressing the issue of whether defendant deserved the jury's mercy: "What mercy did [defendant] show to Tony [Iuli] when he put out a contract on his life, when Tony decided to come forward?" We previously have addressed the admissibility of testimony referencing the alleged contract on Iuli's life, and concluded the evidence was admissible despite the rule against hearsay because the testimony was admitted, not for its truth, but to bolster Iuli's credibility. (*Ante*, pt. I.B.1.c.) We also concluded any error was harmless. Defendant now reprises the issue, claiming the prosecutor's penalty phase argument exploited the improper evidence of the alleged contract by inviting the jurors to use it "as a factor in aggravation when there was no competent evidence to support it." Such argument, defendant contends, violated his constitutional right to due process and to a reliable penalty phase determination as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

We conclude defendant forfeited this issue by the failing to object. Although defendant contends an objection was not required, we disagree. The first time the issue of the alleged contract arose, the challenged testimony— although not competent evidence that such a contract actually existed—was at least partially admissible for the nonhearsay purpose of bolstering Iuli's credibility. But when the prosecutor mentioned it in her penalty phase closing argument, she spoke of the contract as if it had been proven by competent evidence. A timely and specific objection would have allowed the trial court to

82

consider whether to strike the argument as lacking a proper evidentiary basis and to admonish the jury to disregard the argument.

### 5. *Gang Status List*

We have previously explained that, with the exception of his claim that exhibit 46 (the gang status list entitled "America's Most Wanted Samoans") was not properly authenticated, defendant's guilt phase challenges to the admission of the exhibit and later prosecutorial argument based on it, were both meritless. (*Ante*, pt. I.B.1.d.) Defendant reprises these arguments, arguing the prosecutor's penalty phase questioning of Iuli about the list elicited inadmissible evidence, and also that her closing argument referencing the list misstated the evidence and thus constituted misconduct.

We first address defendant's evidentiary claim. At the penalty phase, Iuli confirmed that exhibit 46 was a typewritten copy he made, while in pretrial detention at juvenile hall, of a handwritten list defendant had given him. Iuli testified the list named the "brothers in our house" and to be on the list was a "badge of honor." On cross-examination by defense counsel, Iuli said the list was not intended to name those who participated in Pamintuan's murder, that the names on the list were people to whom defendant and Iuli were close, and that the names were in order of age, oldest to youngest. Iuli said he did not ask defendant what he meant by the phrase "America's Most Wanted Samoans," and merely typed up what defendant gave him.

Defendant did not object to this testimony, a point he acknowledges, but argues any objection would have been futile in light of the trial court's admission of exhibit 46 at the guilt phase. We need not resolve the forfeiture point because defendant does not in any event identify any ground on which the trial court could have excluded Iuli's penalty phase testimony. Unlike Tautai's testimony at the

83

guilt phase, Iuli testified at the penalty phase that he had personal knowledge about the list: He typed it up from defendant's handwritten list, and he recognized the names and explained why they were on the list (i.e., they were "brothers in our house"). Defendant's evidentiary complaint appears to center on what Iuli *did not* say: He did not say the list had anything to do with Pamintuan's murder, or that the order of names had anything to do with criminal behavior by the Sons of Samoa street gang. Defendant complains that the prosecutor made such assertions in her closing argument, but whether or not those comments were a fair extrapolation from Iuli's testimony, Iuli never actually said those things and defendant thus posits no ground on which Iuli's penalty phase testimony could have been excluded even had an objection been made.

Admission of the evidence aside, defendant contends primarily that the prosecutor committed misconduct during her closing penalty phase argument by referring to Iuli's testimony as evidence defendant lacked remorse for his crimes. He claims the prosecutor misstated the evidence and alluded to evidence that did not exist. In support, he cites this portion of the prosecutor's argument: "Now that you know the real truth, the real evidence, the brutality of this crime, and you know how it not only destroyed a single life, not only a single human being's life, not only a kind, unselfish, compassionate young person's life, but his whole family and his bride's family, and it turned his wedding day into a day of unending despair.

"All of those who know and love Nolan will never wake up from this darkest nightmare. And this nightmare is the handiwork of Afatia Ropati Seumanu, *for which he has named himself one of America's most wanted Samoans, a badge of honor that he awarded to himself for blowing Nolan's chest to pieces*." (Italics added.)

That this claim was forfeited by failure to object is immediately apparent.

84

In contrast to the evidentiary claim, no reason appears to justify the failure to object to this argument for—if defendant is correct that Ms. Backers misstated the evidence and referred to facts not in evidence—an objection (and request the jury be admonished) would not have been rendered futile by the earlier admission of the evidence.

Were we to address the issue, we would find no misconduct. "The prosecution is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it." (*People v. Harris*, *supra*, 37 Cal.4th at p. 345; see *People v. Hill*, *supra*, 17 Cal.4th at p. 819.) The phrase "most wanted" is generally associated with the Federal Bureau of Investigation's list of the most dangerous criminals extant. (See *People v. Parson*, *supra*, 44 Cal.4th at p. 339 [U. S. Marshals placed the defendant "on their list of 'top 15 most-wanted fugitives' "].) By labeling himself as "America's Most Wanted Samoan[]," it was reasonable to infer that defendant was boasting of his criminal exploits, including Pamintuan's murder, and that he thus lacked remorse for his crimes.

### 6. Darrell Churish's Testimony

Darrell Churish testified that he was driving somewhere with defendant when they spotted a large man at a bus stop wearing a Georgetown University jacket. Churish reported that defendant exited the car and physically confronted the man, who removed the coat and gave it to defendant. The prosecutor then asked Churish if defendant had ever offered to take someone's coat to give to him. Churish replied that one time when he was with defendant, he admired an Oakland Raiders jacket someone was wearing and defendant asked him if he wanted it. Churish told him no because he would not be able to explain the acquisition of such a garment to his mother. The prosecutor asked: "He was going to take it off

that guy for you, right?" Churish answered: "Probably, yeah." There was no objection.

Defendant contends Churish's assertion that defendant would have forced someone to give up his jacket for Churish's benefit was mere speculation and conjecture and therefore inadmissible. (See *People v. Coddington* (2000) 23 Cal.4th 529, 599, overruled on other grounds in *Price v. Superior Court*, *supra*, 25 Cal.4th at p. 1069, fn. 13 [" ' "A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' "].) Defendant further contends the prosecutor's question that elicited this information was improperly leading and, because she knew it called for inadmissible evidence, constituted misconduct. (See *People v. Gray* (2005) 37 Cal.4th 168, 216 [prosecutor commits misconduct by intentionally eliciting inadmissible evidence].) Finally, defendant claims these twin state-law errors violated his rights under the Eighth Amendment to the United States Constitution because they diminished the reliability of the jury's penalty verdict.

All of these claims were forfeited by defendant's failure to object. An objection is necessary to preserve for appeal questions regarding the admissibility of evidence (Evid. Code, § 353, subd. (a); *People v. Jones*, *supra*, 57 Cal.4th at p. 977) and prosecutorial misconduct (*People v. Hill*, *supra*, 17 Cal.4th at p. 820). Defense counsel's sole objection to the witness's testimony came after the question asking Churish about the type of jacket he had admired, but can reasonably be assumed to have been directed at Churish's previous answer. That solitary objection was insufficient to alert the trial court that defendant intended to challenge the witness's further testimony that he believed defendant intended to take a stranger's property by force to satisfy Churish's fashion desires, and that defendant further believed the prosecutor was engaging in misconduct by

intentionally eliciting inadmissible evidence. Accordingly, we find the issues now raised were forfeited by the failure to object.

### 7. *Effect of Alleged Guilt Phase Errors in the Penalty Phase*

Defendant contends three alleged errors occurring at the guilt phase worked synergistically to deny him a fair penalty phase trial. Citing his claim the prosecutor improperly used his postarrest silence against him (*Doyle v. Ohio*, *supra*, 426 U.S. 610) (*ante*, pt. I.B.4.a.), the alleged judicial misconduct flowing from the trial court's offhand comment, "I know the temptation" (*ante*, pt. I.B.2.), and the prosecutor's alleged misconduct in questioning Tautai regarding whether the witness had sought to obtain a plea deal (*ante*, pt. I.B.4.d.), defendant argues the combined effect of these alleged guilt phase errors requires reversal of the penalty judgment because all involve "[t]he circumstances of the crime of which the defendant was convicted" under section 190.3, factor (a), and the errors improperly inflated the number of aggravating circumstances available for the jury's consideration. As we explained above, however, defendant's claim of *Doyle* error, as well as the argument based on the trial court's fleeting comment, were forfeited and meritless. Further, the prosecutor's use of the failed plea negotiations when questioning Tautai was harmless and any claim thereon forfeited. We thus reject the claim of cumulative prejudice.

### 8. *Cumulative Prejudice from Guilt and Penalty Phase Errors*

Defendant contends the accumulation of the many alleged errors and acts of misconduct occurring in both the guilt and penalty phases of trial worked together to deny him a fair penalty trial. We have previously discussed each allegation individually and found most claims were forfeited for appeal, many are substantively meritless, and all were nonprejudicial. In particular, the prosecutor's two possible missteps (asking the jury to view the crime through the eyes of the

victim, and referring to Pamintuan as her "client") were, as explained, not prejudicial in light of the strong evidence of guilt and the instruction informing the jury that the arguments of counsel are not evidence. (*Ante*, pt. I.B.4.c.) Defendant argues that balanced against these errors was a "substantial case in mitigation" but even if true, the argument ignores the very substantial case in aggravation. On balance we find no cumulative prejudice requiring reversal.

### 9. Admission of Victim Impact Evidence

Defendant contends the admission of victim impact evidence, in the form of the testimony from the victim's intended bride, Rowena Panelo, his brother Paul Pamintuan, and his mother, Dr. Clementina Manio, although permissible under the Eighth Amendment (*Payne v. Tennessee*, *supra*, 501 U.S. 808), violated Penal Code section 190.3, factor (a) because the victim's positive qualities do not fairly constitute the "circumstances of the crime." Although defendant admits we have held otherwise (see, e.g., *People v. Edwards*, *supra*, 54 Cal.3d at p. 835 ["factor (a) of section 190.3 allows evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim"]; *id.* at p. 836), he contends none of our decisions has considered the actual meaning of the statutory phrase "circumstances of the crime" as informed by this court's interpretation of the same phrase in *People v. Love* (1960) 53 Cal.2d 843 (disapproved on another ground in *People v. Williams* (1981) 29 Cal.3d 392). Defendant would thus have us distinguish a long line of precedent (e.g., *People v. Edwards*, *supra*, 57 Cal.4th at p. 755; *People v. Tully* (2012) 54 Cal.4th 952, 1031; *People v. Boyette* (2002) 29 Cal.4th 381, 444; *People v. Stanley* (1995) 10 Cal.4th 764, 832),[20] on the

---

[20]     Because we agree an objection to the victim impact evidence would have been futile in light of the long line of cases permitting the admission of such

*(footnote continued on next page)*

ground that these prior cases did not specifically address the argument he now raises (see *People v. Brown* (2012) 54 Cal.4th 314, 330 ["cases are not authority for propositions not considered"]).  We thus turn to a consideration of defendant's claim.

The centerpiece of defendant's claim is *People v. Love*, *supra*, 53 Cal.2d 843.  In that case, the defendant, charged with murdering his wife, objected at his capital trial to the admission, during the penalty phase, of a "a photograph showing a front view of the deceased lying on a hospital table" (*id*. at p. 854) and an audio recording allowing the jury to "hear the failing voice and the groans of the [victim] as she was dying" (*id*. at pp. 854–855).  The case, which arose in 1958, was governed by the death penalty law enacted in 1957, and the admissibility of evidence under that law.  That law provided in pertinent part that after finding the defendant guilty of murder "there shall thereupon be further proceedings on the issue of penalty, and the trier of fact shall fix the penalty.  Evidence may be presented at the further proceedings on the issue of penalty, of *the circumstances surrounding the crime*, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty."  (Former § 190.1; added by Stats. 1957, ch. 1968, § 2, pp. 3509–3510, italics added.)[21]

This court found the admission of the photograph and recording was reversible error.  "The determination of penalty . . . must be a rational decision.

---

*(footnote continued from previous page)*

evidence, we find the issue is properly before us despite the absence of an objection.

[21]    Former section 190.1 was, for other reasons, declared unconstitutional under the California Constitution in *People v. Anderson* (1972) 6 Cal.3d 628, 656-657.

Evidence that serves primarily to inflame the passions of the jurors must therefore be excluded, and to insure that it is, the probative value and the inflammatory effect of proffered evidence must be carefully weighed." (*People v. Love*, *supra*, 53 Cal.2d at p. 856.) Regarding the photograph and the recording, we found the evidence to have "no significant probative value" (*ibid.*) absent some evidence that the victim's pain was "intentionally inflicted" (*ibid.*). "[E]ven if relevant and material, [the victim's] pain was more than adequately described by the doctor. There was no need to show the jurors the expression of her face in death or to fill the courtroom with her groans. Both the photograph and the tape recording served primarily to inflame the passions of the jurors and both should have been excluded." (*Id.* at pp. 856–857.)

Defendant contends the 1957 law's use of the phrase "the circumstances surrounding the crime" substantially mirrors language used in current section 190.3, factor (a)—"The circumstances of the crime of which the defendant was convicted"—such that both phrases must be given the same construction. He thus seeks to invoke the rule of statutory construction that "[w]here . . . legislation has been judicially construed and a subsequent statute on the same or an analogous subject uses identical or substantially similar language, we may presume that the Legislature intended the same construction, unless a contrary intent clearly appears." (*Estate of Griswold* (2001) 25 Cal.4th 904, 915–916.) But even were we to assume *People v. Love* concerned victim impact evidence, defendant's reasoning has a fatal flaw: *Love* did not purport to interpret the meaning of the statutory phrase in question to reach its decision. To be sure, the *Love* court found the evidence had "no significant probative value" unless it could be proved that the defendant "intentionally inflicted" the victim's pain. (*People v. Love*, *supra*, 53 Cal.2d at p. 856.) But the *Love* court also reasoned there were "less inflammatory methods of imparting to the jury the same or substantially the same

90

information" (*ibid*.), and that the key problem with the evidence was that there were other ways to give the jury the same information. There was also a sense the challenged evidence was improperly cumulative, as the victim's pain had already been described by the doctor. (*Id*. at pp. 756–857.) In short, *Love* explains, there was no particular need to present this information anew to the jury in the form of overly emotional evidence. "Both the photograph and the tape recording served primarily to inflame the passions of the jurors and both should have been excluded." (*Id*. at p. 857.) We conclude *Love* did not purport to give the phrase "the circumstances surrounding the crime" a narrow interpretation so as to preclude evidence of the crime's impact on surviving family and friends. Even assuming for argument that *Love* has not been overtaken by subsequent judicial decisions concerning the admissibility of victim impact evidence in capital trials, it has no bearing on the meaning of section 190.3, factor (a) as presently written.

### 10. The Impact of Delay on the Constitutionality of the California Death Penalty Law

While the appeal in this case was pending, the United States District Court for the Central District of California issued its opinion in *Jones v. Chappell*, *supra*, 31 F.Supp.3d 1050 (*Jones*), a case in which a California capital defendant challenged his sentence of death in a federal habeas corpus petition. *Jones* concluded that systemic delays in implementing the death penalty under California law have rendered execution of the penalty so arbitrary that its imposition would violate the prisoner's rights under the Eighth Amendment to the United States Constitution. The state has appealed that decision to the Ninth Circuit Court of Appeals and, as of this writing, that appeal is pending. (*Jones v. Chappell* (9th Cir., Aug. 21, 2014, No. 14-56373).) Following the district court's decision, defendant Seumanu filed a supplemental opening brief in this court, raising the same Eighth Amendment/delay issue and relying heavily on the federal court's

reasoning.  As we explain, although we do not in this case pass on the viability or legitimacy of what we will here call a "*Jones* claim," i.e., a claim that systemic delay in resolving postconviction challenges to death penalty judgments has led to a constitutionally intolerable level of arbitrariness in the implementation of the penalty, we conclude that—assuming such a claim exists—it has not been proved here.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  Although this key provision of the Bill of Rights applies to the states (*Glossip v. Gross* (2015) ___ U.S. ___ [2015 WL 2473454, p. 9]; *Robinson v. California* (1962) 370 U.S. 660, 666–667; *In re Anderson* (1968) 69 Cal.2d 613, 629, fn. 6),[22] we have, in the past, rejected the claim that delay in deciding postconviction challenges in capital cases constitutes cruel and unusual punishment.  As we explained in *People v. Anderson* (2001) 25 Cal.4th 543, "delay inherent in the automatic appeal process is not a basis for concluding that either the death penalty itself, or the process leading to its execution, is cruel and unusual punishment." (*Id.*, at p. 606, citing *People v. Massie* (1998) 19 Cal.4th 550, 574, and *People v. Hill* (1992) 3 Cal.4th 959, 1016.)  "[T]he automatic appeal process following judgments of death is a constitutional safeguard, not a constitutional defect [citations], because it assures careful review of the

---

**22**    Although the state Constitution has its own prohibition on cruel or unusual punishment (Cal. Const., art. I, § 17), a different section in article I provides in part that the "death penalty . . . shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments within the meaning of Article I, Section 6 nor shall such punishment . . . be deemed to contravene any other provision of this constitution" (*id.*, art. I, § 27).  Our discussion is thus limited to the Eighth Amendment to the United States Constitution, which is in any event the only legal authority defendant invokes.

defendant's conviction and sentence [citation]. Moreover, an argument that one under judgment of death suffers cruel and unusual punishment by the inherent delays in resolving his appeal is untenable. If the appeal results in reversal of the death judgment, he has suffered no conceivable prejudice, while if the judgment is affirmed, the delay has prolonged his life." (*People v. Anderson*, *supra*, at p. 606.) We have cited *Anderson* for this proposition many times since it was decided. (See *People v. McDowell* (2012) 54 Cal.4th 395, 412; *People v. Demetrulias* (2006) 39 Cal.4th 1, 45; *People v. Dunkle* (2005) 36 Cal.4th 861, 942; *People v. Jones* (2003) 29 Cal.4th 1229, 1267; see also *People v. Bennett* (2009) 45 Cal.4th 577, 630 [generally rejecting 8th Amend. delay claim]; *People v. Panah* (2005) 35 Cal.4th 395, 500 [same].)

But although we have consistently, and recently, rejected the Eighth Amendment/delay claim, doctrine can evolve. This is especially true when interpreting the Eighth Amendment, which was ratified in 1791. The United States Supreme Court has recognized that the notion of cruel and unusual punishment is not a concept carved in 18th-century stone, instead explaining that although "the words of the [Eighth] Amendment are not precise, . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." (*Trop v. Dulles* (1958) 356 U.S. 86, 100–101, fn. omitted; see *People v. Trinh* (2014) 59 Cal.4th 216, 237 [holding the California law permitting penalty phase retrials, although rare when compared to the statutory schemes of other states, does not violate the *Trop* standard].) "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards." (*Trop v. Dulles*, *supra*, at p. 100.)

Accordingly, although this court has consistently rejected the Eighth Amendment/delay argument, defendant's reliance on the recently decided *Jones*, *supra*, 31 F.Supp.3d 1050, provides an opportunity to reconsider whether our prior position on this issue remains valid and supportable. "As with many rules of law, multiple repetitions over time may tend to obscure the original purpose of the rule." (*In re Harris* (1993) 5 Cal.4th 813, 826; *Hyde v. United States* (1912) 225 U.S. 347, 391, dis. opn. of Holmes, J. ["It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis."].)

Our examination of defendant's claim reveals it to be subtly different from the Eighth Amendment claim rejected by *People v. Anderson*, *supra*, 25 Cal.4th 543, and its progeny, rendering that line of authority a less than perfect refutation of the claim now before the court. *Anderson* and later cases addressed what is known as a "*Lackey* claim," which takes its name from a memorandum opinion on denial of certiorari by Justice John Paul Stevens in *Lackey v. Texas* (1995) 514 U.S. 1045. (See *Muhammad v. Florida* (2014) ___ U.S. ___ [134 S. Ct. 894] (Breyer, J., mem. opn. on denial of cert.) [same]; *Johnson v. Bredesen, Governor of Tennessee, et al.* (2009) 558 U.S. 1067 (Stevens, J., with Breyer, J., mem. opn. on denial of cert.) [same].) Such a claim argues that a lengthy period of incarceration on death row awaiting execution is impermissibly cruel and unusual because the long delay robs the ultimate penalty of any legitimate retributive value, diminishes to the vanishing point any deterrence value to an execution, and is psychologically damaging to the condemned inmate to an unjustifiable degree. (See *Glossip v. Gross*, *supra*, ___ U.S. at p. ___ [2015 WL 2473454, p. 43] (dis. opn. of Breyer, J., joined by Ginsburg, J.) ["lengthy delays both aggravate the cruelty of the death penalty and undermine its jurisprudential rationale"].)

94

*Lackey* claims are usually denied in the lower federal courts, sometimes on the merits (see, e.g., *Smith v. Mahoney* (9th Cir. 2010) 611 F.3d 978, 998; *Thompson v. Secretary for Dept. of Corrections* (11th Cir. 2008) 517 F.3d 1279, 1284), and sometimes on procedural grounds (e.g., *Ibarra v. Thaler* (5th Cir. 2012) 687 F.3d 222, 224–225 & fn. 1), although not all federal judges are in agreement (see *Ceja v. Stewart* (9th Cir. 1998) 134 F.3d 1368, 1376 (dis. opn. of Fletcher, J. from summary refusal to stay execution) [noting the claim "that having a death sentence hanging over one's head subjects one to extraordinary psychological duress, as well as the extreme physical and social restrictions that inhere in life on death row, and that it constitutes cruel and unusual punishment to impose such conditions of stress upon a death row inmate for a period of decades" and concluding the issue is "of the highest importance"]; *Gretzler v. Stewart* (9th Cir. 1998) 146 F.3d 675, 676 (dis. opn. of Pregerson, J.) [opining that he would grant a stay and remand to allow the lower court to consider a *Lackey* claim on the merits]; see also *McKenzie v. Day* (9th Cir. 1995) 57 F.3d 1461, 1488 (dis. opn. of Norris, J.) [*Lackey* claim "is substantial, important, and deserving of careful and thoughtful adjudication"]).  Although the United States Supreme Court has yet to definitively embrace or reject a *Lackey* claim in a full opinion, two justices recently suggested they find the claim potentially meritorious.  (*Glossip v. Gross*, *supra*, ___ U.S. at p. ___ [2015 WL 2473454, p. 43] (dis opn. of Breyer, J., joined by Ginsburg, J.).)

Although also based on a long postconviction delay, defendant's claim is different from a *Lackey* claim.  Relying on *Jones*, *supra*, 31 F.Supp.3d 1050, he claims the systemic delays in implementing the death penalty in California *render its implementation arbitrary*, thus violating the Eighth Amendment's prohibition of cruel and unusual punishments.  According to *Jones*, "California's death penalty system is so plagued by inordinate and unpredictable delay that the death

95

sentence is actually carried out against only a trivial few of those sentenced to death." (*Jones*, *supra*, at p. 1062.)  Of those few selected to be executed, "their selection for execution will not depend on whether their crime was one of passion or of premeditation, on whether they killed one person or ten, or on any other proxy for the relative penological value that will be achieved by executing that inmate over any other.  Nor will it even depend on the perhaps neutral criterion of executing inmates in the order in which they arrived on Death Row.  Rather, it will depend upon a factor largely outside an inmate's control, and wholly divorced from the penological purposes the State sought to achieve by sentencing him to death in the first instance:  how quickly the inmate proceeds through the State's dysfunctional post-conviction review process." (*Ibid*.)  Although the concern over the continuing ability of the death penalty to serve the state's legitimate interest in retribution and deterrence is also relevant to a *Lackey* claim, the kernel of a *Jones* claim is not the delay per se, but the *arbitrariness* that such delay injects into the system.

According to *Jones*, *supra*, 31 F.Supp.3d at page 1063, for a defendant "to be executed in such a system, where so many are sentenced to death but only a random few are actually executed, would offend the most fundamental of constitutional protections—that the government shall not be permitted to arbitrarily inflict the ultimate punishment of death.  *See Furman* [*v. Georgia* (1972)] 408 U.S. [238, 293] (Brennan, J., concurring) ('When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily.  Indeed, it smacks of little more than a lottery system.')."  Although *Furman* addressed arbitrariness as it affected the selection of offenders eligible for the death

penalty,[23] and not—as here—which among those already sentenced to death would actually be executed, *Jones* concluded that "[t]he Eighth Amendment simply cannot be read to proscribe a state from randomly selecting which few members of its criminal population it will sentence to death, but to allow that same state to randomly select which trivial few of those condemned it will actually execute. Arbitrariness in execution is still arbitrary, regardless of when in the process the arbitrariness arises." (*Jones*, *supra*, at p. 1063.)

In sum, although both *Lackey* and *Jones* claims stem from a concern over how a long postconviction delay in carrying out the death penalty may be squared with the Eighth Amendment's constitutional limitations, they are distinct. A *Lackey* claim examines how a long postconviction delay affects the state's interest in retribution and deterrence, as well as the allegedly psychologically brutalizing effect on the condemned inmate; a *Jones* claim, by contrast, examines whether a long postconviction delay leads to the infliction of a criminal sanction in a manner that is so arbitrary that its imposition can be characterized as cruel and unusual. We now turn to this latter issue.

Assuming for argument we were to agree with the federal judge in *Jones*, *supra*, 31 F.Supp.3d 1050, that long and systemic delays in postconviction review of death penalty verdicts could render the capital case system in this state impermissibly arbitrary in violation of the Eighth Amendment, an initial obstacle to reaching such a conclusion in this case is the inadequate state of the record. The issue comes to us on direct appeal and review is limited to facts in the

---

**23** *Furman* "has been authoritatively interpreted as holding that the death penalty cannot 'be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.' " (*People v. Frierson* (1979) 25 Cal.3d 142, 173.)

appellate record.  By contrast, in *Jones*, the federal court confronted the issue on habeas corpus, where the petitioner could produce supporting facts and evidence from outside the appellate record.  To the extent the petitioner in *Jones* alleged facts by citing the Final Report of the California Commission on the Fair Administration of Justice (2008),[24] sites maintained by the California Department of Corrections and Rehabilitation[25] and the Office of the Attorney General,[26] and articles by legal writers and scholars,[27] we can take judicial notice of the same facts.  (Evid. Code, § 452, subd. (h) [court can take judicial notice of "(h) Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."].)  But the petitioner in *Jones* also presented key facts to the federal court in the form of two declarations by the Director of the Habeas Corpus Resource Center, neither of which is in the record before us or properly subject to judicial notice.

---

[24]    <http://www.ccfaj.org/documents/CCFAJFinalReport.pdf> (as of August 24, 2015).

[25]    For example:  <http://www.cdcr.ca.gov/capital_punishment/docs/ condemnedinmatelistsecure.pdf> [as of August 24, 2015].

[26]    For example:  <http://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/ publications/homicide/hm11/hm11.pdf> [as of August 24, 2015].
[27]    For example, *Jones v. Chappell*, *supra*, 31 F.Supp.3d 1050, cites Uelmen, *Death Penalty Appeals and Habeas Proceedings: The California Experience* (2009) 93 Marq. L.Rev. 495; Alarcón & Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or End the California Legislature's Multi-Billion-Dollar Death Penalty Debacle* (2011) 44 Loy. L.A. L.Rev. S41, S61; and Alarcón, *Remedies for California's Death Row Deadlock*  (2007) 80 S.Cal. L.Rev. 697, 734.

For example, citing the latter declarations, the federal court found the following assertions factually true:  (1) "[A]s of June 2014, 352 inmates—nearly half of Death Row—were without habeas corpus counsel." (*Jones*, *supra*, 31 F.Supp.3d at p. 1058.)  (2) "Currently, of the 352 inmates without habeas counsel, 159 have been awaiting appointment of such counsel for more than ten years." (*Ibid*.)  (3) "[T]here are 76 inmates whose direct appeals have been fully denied by the California Supreme Court but still lack habeas counsel." (*Ibid*.)  (4) Such inmates "have already waited an average of 15.8 years after the imposition of their death sentence for habeas counsel to be appointed, and are still waiting." (*Ibid*.).

Given that the People do not contest the accuracy of these alleged facts, however, we will assume for purposes of argument that the facts before the *Jones* court are accurate.  We will further assume for purposes of argument that *Furman v. Georgia*, *supra*, 408 U.S. 238, and its progeny are not limited to the earlier selection process from among the class of all murderers, but prohibit as well arbitrariness in the selection for execution from among those already adjudged guilty and deserving of the death penalty.[28]  (But see, *Glossip v. Gross*, *supra*, ___ U.S. at p. ___ [2015 WL 2473454, p. 23] (conc. opn. of Thomas, J., joined by

---

[28] "As long as a state's capital sentencing scheme 'narrows the class of death-eligible murderers' and then during sentence selection permits the exercise of discretion and does not limit consideration of evidence in mitigation, the United States Supreme Court has stated that the Eighth Amendment 'requires no more.' (*Lowenfield v. Phelps* [(1988)] 484 U.S. [231] at p. 246; accord, *California v. Brown* (1987) 479 U.S. 538, 541.)  Indeed, the high court found no constitutional defect in a capital sentencing scheme that in the sentence selection process afforded the sentencer 'unbridled discretion' in deciding what sentence to impose on a defendant within the narrowed class of persons eligible for the death penalty. (*Zant v. Stephens* [(1983)] 462 U.S. [862] at p. 875.)" (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 466–467.)

Scalia, J.) [describing the rule against arbitrariness in imposing the death penalty "an imaginary constitutional rule"].)

Even operating under these twin assumptions, we conclude defendant has not, on this record, demonstrated that systemic delays have produced arbitrariness that is violative of the Eighth Amendment. Our conclusion would be different were the California Department of Corrections and Rehabilitation to ask all capital inmates who have exhausted their appeals to draw straws or roll dice to determine who would be the first in line for execution. But the record in this case does not demonstrate such arbitrariness. Unquestionably, some delay occurs while this court locates and appoints qualified appellate counsel, permits those appointed attorneys to prepare detailed briefs, allows the Attorney General to respond, and then carefully evaluates the arguments raised, holds oral argument, and prepares a written opinion. Further delays occur when this court locates and appoints qualified counsel for habeas corpus, allows ample time for counsel to prepare a petition, and then evaluates the resulting petition and successive petitions. But such delays are the product of "a constitutional safeguard, not a constitutional defect [citations], because [they] assure[] careful review of the defendant's conviction and sentence." (*People v. Anderson*, *supra*, 25 Cal.4th at p. 606.)

Although the *Jones* court found that systemic delays cause the state to apply an arbitrary and irrational standard for deciding whom to execute (see *Jones*, *supra*, 31 F.Supp.3d at p. 1062 [choosing whom to execute depends on factors "wholly divorced" from any valid "penological purposes"]), the facts before that court did not explain *why* the death penalty review process takes as long as it does at certain points, nor do they shed light on the reasons behind the variability in the time it takes for cases to progress through the review process. That some inmates will exhaust their appeals and collateral attacks sooner than others, that some will obtain relief on appeal or on habeas corpus and others not, is inevitable given the

complexity of the judicial review process. These differences are not necessarily attributable to arbitrariness in the process of review under state law, but may instead represent the legitimate variances present in each individual case. Such differences may include variances in the nature of the underlying facts, the length of record, the quality of the briefing, and the complexity and number of issues raised by the parties. For some defendants the appointed attorneys will need more time to prepare and file an opening brief or habeas corpus petition due to the relative complexity of the issues involved, and the Attorney General will for the same reasons in some cases need additional time to respond. In some cases the trial record will take longer to certify as correct due to length or legitimate accuracy concerns. That capital case appeals and habeas corpus petitions are not decided in a purely chronological first in, first out manner may simply reflect the variation in the cases and this court's individual consideration of each case, and thus not demonstrate any intrinsic arbitrariness within the meaning of the Eighth Amendment.

Nor is it clear from the record before us (even assuming we may consider the facts before the *Jones* court) how the process may be labeled "arbitrary," given the innumerable variables in play that affect the overall delay in this court in resolving capital appeals and habeas corpus petitions. To characterize the system of reviewing death penalty judgments as arbitrary as a result of long postconviction delays suggests randomness or a lack of rationality. But allowing each case the necessary time, based on its individual facts and circumstances, to permit this court's careful examination of the claims raised is the opposite of a system of random and arbitrary review. As one federal appellate court has stated: "The essential point for our purposes, of course, is whether or not the Eighth Amendment is being violated. We believe that delay in capital cases is too long. But delay, in large part, is a function of the desire of our courts, state and federal,

101

to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life." (*Chambers v. Bowersox* (8th Cir. 1998) 157 F.3d 560, 570, fn. omitted.; see *Zant v. Stephens* (1983) 462 U.S. 862, 885 ["although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error."].) Without concrete evidence of the reasons why cases take as long as they do and why some cases take so much longer than others, we cannot conclude that postconviction delays affecting the imposition of a death sentence are arbitrary, let alone so arbitrary as to violate the Eighth Amendment.

In sum, assuming for argument the facts before the court in *Jones v. Chappell*, *supra*, 31 F.Supp.3d 1050, were before this court, and further assuming that evidence of systemic delay could implicate a capital defendant's rights under the Eighth Amendment (i.e., a *Jones* claim), we conclude defendant has not on this record demonstrated that delays in implementing the death penalty under California law have rendered that penalty impermissibly arbitrary. We thus reject his *Jones* claim for purposes of this appeal. Any such claim is more appropriately presented in a petition for habeas corpus, where a defendant can present necessary evidence outside the appellate record.

*11. Constitutional Challenges to California's Death Penalty Statute*

Defendant contends several features of California's death penalty law, as interpreted by this court, violate the United States Constitution. He concedes "most of these features [of the law] have been rejected by this Court" and so "presents these arguments here in an abbreviated fashion," presumably in order to preserve his rights in federal court. We address and reject them in a similarly brief manner:

1. "California's special circumstances (see § 190.2) adequately narrow the class of murderers eligible for the death penalty." (*People v. Duff*, *supra*, 58 Cal.4th at p. 568.)

2. "Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty." (*People v. Duff*, *supra*, 59 Cal.4th at p. 569.)

3. Neither the state nor federal Constitution requires the prosecution bear the burden of proof or persuasion at the penalty phase of a capital trial, or requires the jury find beyond a reasonable doubt that (1) the aggravating factors have been proved, (2) the aggravating factors outweigh the mitigating factors, or (3) death is the appropriate sentence. Moreover, none of the United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) require a different result (*People v. Jones*, *supra*, 57 Cal.4th at pp. 979–980).

4. Neither "the Sixth, Eighth, or Fourteenth Amendment require[s] written findings or other specific findings by the jury regarding the aggravating factors." (*People v. Bunyard* (2009) 45 Cal.4th 836, 861.)

5. "The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment (U.S. Const., 6th, 8th, & 14th Amends.), do not require intercase proportionality review on appeal." (*People v. Mai* (2013) 57 Cal.4th 986, 1057.)

6. "Admitting evidence of prior unadjudicated crimes in aggravation does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment guarantees of fair

trial, trial by an impartial jury . . . and reliability. . . ." (*People v. Prince* (2007) 40 Cal.4th 1179, 1297.)

7. "The Fifth, Sixth, Eighth, and Fourteenth Amendments are not violated by the use of the adjectives 'extreme' and 'substantial' in connection with section 190.3, factors (g) and (d)." (*People v. Bunyard, supra,* 45 Cal.4th at p. 861.)

8. "The trial court was not constitutionally required to inform the jury that certain sentencing factors are relevant only in mitigation, and the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not unconstitutionally suggest that the absence of such factors amounted to aggravation." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 228.)

9. California's use of the death penalty law does not violate international norms of humanity and decency. (*People v. Jones*, *supra*, 57 Cal.4th at p. 981.)

### III. CONCLUSION

The guilt and penalty phase judgments are affirmed in their entirety.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**PERLUSS, J.**\*

---

\*   Presiding Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Seumanu

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S093803
**Date Filed:** August 24, 2015

_____

**Court:** Superior
**County:** Alameda
**Judge:** Larry J. Goodman


_____

**Counsel:**

Mark David Greenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler and Ronald S. Matthias, Assistant Attorneys General, Nanette Winaker, Kelly Croxton and Glenn R. Pruden, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark David Greenberg
484 Lake Park Avenue, No. 429
Oakland, CA  94610
(510) 452-3126

Nanette Winaker
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5934